(No. 62398.—

(No. 65105.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. MARIO FLORES, Appellant.

*Opinion filed March 29, 1989.—Rehearing denied May 26, 1989.*

70

Julius Lucius Echeles, of Chicago, for appellant.

Neil F. Hartigan, Attorney General, of Springfield, and Richard M. Daley, State's Attorney, of Chicago (Mark S. Rotert, Assistant Attorney General, of Chicago, and Thomas V. Gainer, Jr., James S. Veldman, and Kenneth T. McCurry, Assistant State's Attorneys, of counsel), for the People.

JUSTICE WARD delivered the opinion of the court:

Following a jury trial in the circuit court of Cook County, the defendant, Mario Flores, was found guilty of the armed robbery (Ill. Rev. Stat. 1985, ch. 38, par. 18—2) and murder (Ill. Rev. Stat. 1985, ch. 38, pars. 9—1(a)(1), (a)(2), (a)(3)) of Gilbert Perez. Upon the State's motion, a death penalty hearing was held, and the jury found that there existed one or more of the aggravating factors set out in section 9—1(b) of the Criminal Code of 1961 (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(b)) and that there were no mitigating factors sufficient to preclude a sentence of death. The trial court then sentenced the defendant to death, but the sentence was stayed (107 Ill. 2d R. 609(a)) pending direct appeal to this court (Ill. Const. 1970, art. VI, §4(b); 107 Ill. 2d R. 603). Before that appeal was heard, the defendant filed a petition under the Post-Conviction Hearing Act (Ill. Rev. Stat. 1985, ch. 38, par. 122—1 *et seq.*), which was denied after an evidentiary hearing. An appeal from that judgment

was consolidated with the defendant's appeal of his conviction and sentence, and both appeals are now before this court.

Evidence at trial showed that on January 1, 1984, the body of the victim, Gilbert Perez, was discovered in an alley at 2259 West St. Paul Avenue in Chicago. Next to the body were four spent shotgun shells and another shell was found three to six feet away. It was stipulated that the cause of death was multiple shotgun wounds resulting in massive injuries to the head, chest and internal organs.

Nancy Lebron testified that she lives in a second floor apartment at 2351 North Avenue in Chicago, which overlooks the intersection of North and Western Avenues. On January 1, 1984, at approximately 2 a.m., Lebron heard what sounded like an auto accident, and looking out her window, she saw a car which had been driven against an electrical light pole at the corner of the intersection. Shortly thereafter, the defendant and Victor Flores, who is not related to the defendant, drove up in a wine colored car and parked a short distance from the intersection. They were later joined by another man, who was driving a black and green car. Gilbert Perez, whom Lebron knew as "Blue Eyes," got out of the car that was parked against the electric pole and was approached by the men in the other two cars.

One of the men put his arms around Perez and, she said, talked to him "as if they were good friends." Meanwhile, the defendant returned to the car he was driving, removed a shotgun from the trunk, and pointed it in the direction of Perez. After one of his companions shouted at him, the defendant put the gun into the backseat of the car and returned to the group. Perez walked to the wine colored car and sat in the front passenger seat. The defendant sat in the backseat and Flores drove away. Lebron stated that as the wine colored car drove

off following the green and black colored car, she wrote down its license plate number, "AA 959," and handed it to her husband.

Rinaldo Guevara, a Chicago police officer and gang crimes specialist with the Chicago police department, testified that on November 10, 1984, he spoke with Lebron, after receiving an anonymous telephone call from a man who said Lebron might have information concerning Perez' death. From an array of photographs, Lebron identified a photograph of the defendant and that of Sammy Ramos and stated that she had seen them with the victim at the intersection of North and Western Avenues on January 1, 1984. Lebron also identified the defendant from a lineup as the man whom she saw carrying the shotgun, and Victor Flores, as the man that was driving the wine colored car when it left with Perez. Guevara testified that the defendant was arrested driving a burgundy, 1982 Buick Regal with the license plate number "AA 9559," which was registered to Lena Flores, the defendant's sister.

Victor Flores testified that in the early morning hours of January 1, 1984, the defendant, driving his sister's 1982 Buick Regal, picked him up. As they were driving down North Avenue, a car driven by Perez passed them at a high rate of speed. They stopped at the intersection of North and Western Avenues where Perez' car, which appeared to have been in an accident, rested against an electric light pole. A few minutes later, Harry Gomez arrived and parked next to them. While they were talking, Gilbert Perez got out of his car and began shouting at a woman in the intersection who was involved in the accident. Flores stated that he, the defendant and Gomez walked to the intersection and approached Perez, who began to threaten them. At one point Perez made a "pitchfork" signal, which, according

to Flores, meant Perez was a member of a street gang known as the Latin Stylers.

Flores testified that the defendant returned to his car, removed a shotgun, and approached the group. After Gomez confronted the defendant, he put the shotgun into the backseat of the car. Gomez then put his "arm around" Perez and led him to the defendant's car. Perez sat in the front seat and the defendant, with the shotgun in his hand, sat in the backseat. Flores drove the defendant's car and followed Gomez several blocks until they stopped on St. Paul Avenue. Flores testified that during the ride the defendant told Perez that Gomez was "Mousey" from the "D's." He explained that the "D's" were a street gang affiliated with a larger gang known as the "Folks," and that they were enemies of the gang he and the defendant belonged to, the Latin Brothers.

After the defendant, Gomez and Perez got out of the cars on St. Paul Avenue, Flores drove the car approximately 40 feet, and as he was turning the car around, he heard "four or five" gunshots. In his side, rearview mirror, Flores saw Perez lying on the ground and the defendant standing next to the body with the shotgun in his hand. Gomez was bending over Perez touching his "upper neck." Flores stated he then drove away but Gomez and the defendant caught up with him and directed him to Gomez' house. There, he saw Gomez with a "handful of chains" (chain necklaces) that Gomez said belonged to Perez.

Sammy Ramos testified on behalf of the State under a grant of immunity. On direct examination, he stated that he could not recall having a conversation with the defendant concerning the death of Perez. Ramos stated that he did recall testifying before the grand jury on November 13, 1984, but could not recall the content of his testimony. After receiving a transcript of the grand jury proceedings to refresh recollection, Ramos acknowledged

that it contained an accurate description of his grand jury testimony. Upon further questioning, Ramos acknowledged he testified before the grand jury that on January 7, 1984, the defendant told him that on New Year's Eve, he and Victor Flores encountered Perez and Harry Gomez at the scene of an accident at the intersection of North and Western Avenues. The defendant said he became angry after Perez started swearing at a woman who was also involved in the accident. He removed a shotgun from the trunk of his car but put it back after Gomez told him to do so. Gomez then told Perez that he was a member of the "Folks" gang, whereupon Perez stated that he was "Blue eyes from the Stylers." The defendant said that the four men drove to Western Avenue and St. Paul Avenue, where he shot Perez six times and Gomez took the victim's chain necklaces from his body.

At the close of the evidence, the jury found the defendant guilty of murder and armed robbery. Thereafter, a hearing was held on the State's motion to seek the death penalty. The jury found the defendant subject to the death penalty, being 18 years of age or older at the time of the murder and having killed the victim in the course of a forcible felony, to wit, armed robbery (Ill. Rev. Stat. 1983, ch. 38, par. 9—1(b)(6)).

At the second phase of the hearing, the State presented in aggravation evidence of the defendant's juvenile adjudications for retail theft, criminal trespass of a vehicle, and possession of a stolen vehicle. Each of these adjudications resulted in the defendant's being placed on probation. The State also presented the testimony of Rinaldo Guevara, who stated that he had known the defendant for five years and that the defendant is a "hardcore" member of the Latin Brothers street gang. Louis Rosero testified that on August 5, 1984, the defendant stopped him on the street and asked if he

would accept a set of tires in lieu of payment for a debt the defendant owed him. The defendant told Rosero to meet him in an alley in back of his father's house. When he arrived, the defendant shot him in the chest five times and twice in the back. As a result, Rosero was rendered a paraplegic and is permanently confined to a wheelchair.

In mitigation, the defendant presented several witnesses who testified to his accomplishments as a high school swimmer and diver. Several witnesses testified to the defendant's good conduct while in custody awaiting trial and his willingness to counsel other inmates. The defendant testified that his life should be spared because he could be of great help to young people coming from "the streets" as he did. The jury found that there were no mitigating factors sufficient to preclude imposition of the death penalty, and the defendant was sentenced to death.

In appeal number 62398, which is the direct appeal from the convictions, the defendant argues that his convictions should be reversed and a new trial ordered on several grounds. First, the defendant contends that he was denied the effective assistance of counsel in violation of the sixth amendment to the Constitution of the United States.

Whether the defendant received ineffective assistance of counsel must be determined under the standards enunciated in *Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052, which were adopted by this court in *People v. Albanese* (1984), 104 Ill. 2d 504. Under *Strickland,* a defendant claiming ineffective assistance of counsel must show: (1) that advice of counsel fell outside the "range of competence demanded of attorneys in criminal cases" and (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have

been different." *Strickland,* 466 U.S. at 687, 694, 80 L. Ed. 2d at 693, 698, 104 S. Ct. at 2064, 2068.

There is a strong presumption that counsel's performance falls within "the wide range of reasonable professional assistance." (*Strickland,* 466 U.S. at 689, 80 L. Ed. 2d at 694, 104 S. Ct. at 2065.) As the Court in *Strickland* explained:

> "Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to secondguess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. [Citation.] A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland,* 466 U.S. at 689, 80 L. Ed. 2d at 694-95, 104 S. Ct. at 2065, quoting *Michel v. Louisiana* (1955), 350 U.S. 91, 101, 100 L. Ed. 83, 93, 76 S. Ct. 158, 164.

It is the defendant's contention that defense counsel was incompetent on the ground that, *inter alia,* he failed to properly cross-examine one of the State's witnesses, Nancy Lebron. He says that defense counsel should have attempted to impeach Lebron's testimony by questioning her on the ability to identify the defendant after seeing him from her second floor apartment window. The record shows, however, that defense counsel vigorously cross-examined Lebron on her powers of visual observation and also on the 11-month delay between

the time she was informed that Perez was murdered and when she notified the police. Too, defense counsel presented the testimony of several witnesses in an effort to impeach her credibility. One of defense counsel's investigators testified that he interviewed Lebron prior to trial and that she had told him that she was unable to identify anyone who was involved in the accident in front of her apartment. The defendant has failed to demonstrate, on the ground of counsel's cross-examination of Lebron, representation which falls below an objective standard of reasonableness.

The defendant contends too that he was denied the sixth amendment guarantee of conflict-free representation of counsel because at the time of trial, defense counsel also represented one of the State's witnesses, Sammy Ramos. He says that counsel's dual representation raised a *per se* conflict of interest which required counsel to withdraw as his attorney, and because counsel did not, he was denied a fair trial.

The record shows that before Ramos took the stand to testify, defense counsel stated:

> "I have represented Sammy Ramos previously. His father contacted me when he learned he was coming back here. He was brought to your courtroom about a week or so ago, at which time he asked to speak to me, and he told me that he doesn't want to testify.
>
> I told him that being Mario's attorney, I would have a conflict in consulting with him. So, my recommendation would be—I believe there is a reluctance on his part to testify.
>
> I have talked with his wife, and I talked with his father. I think that, maybe, it would be best if we had a public defender or something here, if we could summon one here to consult with him to testify or let him know what his rights are."

Ramos stated that he intended to exercise his fifth amendment right and remain silent. The court thereupon

ordered that the cause be held over until the following day and appointed an assistant public defender to represent Ramos.

It is clear, of course, that the right to effective assistance of counsel under the sixth amendment to the Constitution of the United States entitles a criminal defendant to the undivided loyalty of counsel, free from conflicting interests or inconsistent obligations. (*Glasser v. United States* (1942), 315 U.S. 60, 86 L. Ed. 680, 62 S. Ct. 457; *People v. Washington* (1984), 101 Ill. 2d 104.) Where defense counsel has represented a State's witness, a *per se* conflict of interest exists if "the professional relationship between the attorney and the witness is contemporaneous with counsel's representation of the defendant." (*People v. Free* (1986), 112 Ill. 2d 154, 168. See also *People v. Robinson* (1979), 79 Ill. 2d 147, 161; *People v. Strohl* (1983), 118 Ill. App. 3d 1084, 1092.) In order to assure and protect a defendant's rights, the defendant need not show prejudice in order to justify a reversal of his conviction if the attorney representing him has an actual or possible conflict of professional interests. *People v. Washington* (1984), 101 Ill. 2d 104, 110.

Contrary to what the defendant asserts, nothing in the record shows that defense counsel represented Ramos at the time of defendant's trial. While defense counsel stated that he had "previously" represented Ramos, he did not say that he represented him at that time or concerning Perez' murder prior to trial. The defendant has failed to show an actual or *per se* conflict of interest on the part of defense counsel.

The defendant contends, however, that the trial court erred in failing to question defense counsel concerning the extent of his representation of Ramos to ascertain whether the risk of conflict was sufficiently strong to

constitute a *per se* conflict of interest warranting the appointment of separate counsel.

Where a potential conflict arises and is brought to the attention of the trial court, a duty devolves upon the trial court either to appoint separate counsel or to take adequate steps to ascertain whether the risk of conflict was too remote to warrant the appointment of separate counsel for the defendant. (*Holloway v. Arkansas* (1978), 435 U.S. 475, 484, 55 L. Ed. 2d 426, 434, 98 S. Ct. 1173, 1178; *People v. Spreitzer* (1988), 123 Ill. 2d 1, 18.) We judge that the trial court took adequate steps under the circumstances to ascertain defense counsel's involvement in the representation of Ramos. In light of the fact that defense counsel stated that he did not represent Ramos and that Ramos stated that he intended to assert his fifth amendment rights and remain silent, the circuit court did not err in failing to question defense counsel further on the matter and in appointing a public defender to represent Ramos.

Where a *per se* conflict of interest is not established, it is the defendant's burden to show an actual conflict of interest and to demonstrate prejudice. *People v. Free* (1986), 112 Ill. 2d 154, 169; *People v. Davis* (1983), 97 Ill. 2d 1, 16.

The defendant argues that he was prejudiced by the fact that defense counsel was precluded from effectively cross-examining Ramos for fear of revealing confidential information imparted to him during their former attorney-client relationship. He says there was incompetence of defense counsel in his failure to call Mirda Alvarez and Lucy Jiminez after they allegedly overheard an assistant State's Attorney tell Sammy Ramos outside the courtroom that he would get an extra year in the penitentiary if he did not testify against the defendant.

Where a claim of conflict of interest is based on the prior representation of a prosecution witness by defense

counsel, the court should examine the possibility that privileged information acquired from the witness might not have been used to impeach the witness though it would have been relevant in cross-examination. (See *United States v. Jeffers* (7th Cir. 1976), 520 F.2d 1256, 1264-65.) The defendant does not, however, show that counsel possessed information obtained from Ramos which might have hampered his cross-examination of the witness. Absent evidence to the contrary, we will not speculate that counsel possessed such information, or if he had, that he chose not to use it for impeachment.

In any event, the defendant has also failed to show that defense counsel's cross-examination was deficient. It must be borne in mind that Ramos did not testify to anything unfavorable to the defendant. Ramos' grand jury testimony was damaging to the defendant but, at trial, Ramos stated he could not recall what his testimony was or whether the defendant ever told him that he had shot Perez. It was only pursuant to section 115—10.1 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1985, ch. 38, par. 115—10.1), and over defense counsel's objections, that the State was able to admit Ramos' grand jury testimony. Under the circumstances, there is very little defense counsel could have cross-examined the witness upon which would have been favorable to the defendant. Defense counsel did, however, elicit on cross-examination statements from Ramos that he had known the defendant for 10 years and that he did not believe that the defendant would shoot Perez. We cannot say that the defendant was prejudiced by defense counsel's cross-examination of Ramos or that counsel had opportunities for cross-examination he did not use.

Nor can it be reasonably argued that defense counsel's failure to call Alvarez or Jiminez as witnesses so prejudiced the defendant that he was denied a fair trial. In general, whether to call a particular witness is a mat-

ter of trial strategy (see *People v. Ashford* (1988), 121 Ill. 2d 55, 74), and our decisions have held that an ineffective assistance of counsel claim " 'which arises from a matter of defense strategy will not *** support a claim of ineffective representation.' " (*People v. Ashford* (1988), 121 Ill. 2d 55, 74, quoting *People v. Madej* (1985), 106 Ill. 2d 201, 214.) It is clear from the record that Ramos was a reluctant witness, for he immediately exercised his fifth amendment right to remain silent, and only after he was granted immunity, did he testify. The prospective testimony of Alvarez and Jiminez would really have been to the same effect, that is, that Ramos was unwilling to testify, so there would be little impeachment value in the testimony of those witnesses. Thus, we cannot say that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *United States v. Strickland* (1981), 466 U.S. 668, 694, 80 L. Ed. 2d 674, 698, 104 S. Ct. 2052, 2068.

It is also the defendant's contention that the trial court erred in admitting the hearsay testimony of Sammy Ramos given before the grand jury. Over defense counsel's objection, the trial court allowed the State to present Ramos' hearsay testimony pursuant to section 115—10.1 (Ill. Rev. Stat. 1985, ch. 38, par. 115—10.1), which provides:

> "In all criminal cases, evidence of a statement made by a witness is not made inadmissible by the hearsay rule if
>
> (a) the statement is inconsistent with his testimony at the hearing or trial, and
>
> (b) the witness is subject to cross-examination concerning the statement, and
>
> (c) the statement—
>
> (1) was made under oath at a trial, hearing, or other proceeding ***."

The defendant argues that Ramos' grand jury testimony was inadmissible under section 115—10.1 on the ground that Ramos' testimony at trial was not "inconsistent" with his grand jury testimony. He contends that simply because Ramos stated he could not remember what he testified to in front of the grand jury does not mean that his testimony was inconsistent within the meaning of the term set out in section 115—10.1.

A witness' prior testimony, however, does not have to directly contradict testimony given at trial to be considered inconsistent within the meaning of that term set out in section 115—10.1. (*People v. Hastings* (1987), 161 Ill. App. 3d 714, 719; *People v. Davis* (1982), 106 Ill. App. 3d 260, 263-64.) Dean Wigmore covered the question: "where a witness now claims to be unable to recollect a matter, a former affirmation of it should be admitted as a contradiction." (See 3A J. Wigmore, Evidence in Trials at Common Law §1018, at 1061 (Chadbourn rev. 1970).) This is the position taken by Federal courts in construing the provisions of Rule 801(d)(1)(A) of the Federal Rules of Evidence (28 U.S.C. R. 801(d)(1)(A) (1982)), which is similar to our section 115—10.1. Rule 801(d)(1)(A) provides that a statement inconsistent with the trial testimony of a witness, and which was given under oath at a trial, hearing or other proceeding, is not hearsay if the declarant testified at the trial and is subject to cross-examination concerning it. In interpreting the meaning of the term "inconsistent" in Rule 801(d)(1)(A), there are Federal decisions holding that inconsistency is not limited to direct contradictions but "may be found in evasive answers, *** silence, or changes in position." (*United States v. Williams* (7th Cir. 1984), 737 F.2d 594, 608; *United States v. Dennis* (8th Cir. 1980), 625 F.2d 782, 795.) The determination of whether a witness' prior testimony is inconsistent with

his present testimony is left to the sound discretion of the trial court. (*People v. Hastings* (1987), 161 Ill. App. 3d 714, 719; *United States v. Thompson* (8th Cir. 1983), 708 F.2d 1294, 1302.) We consider that the trial court's decision that Ramos' professed memory loss as to statements he made before the grand jury was inconsistent with his previous testimony was not an abuse of discretion. See *United States v. DiCaro* (7th Cir. 1985), 772 F.2d 1314, 1322; *United States v. Distler* (6th Cir. 1981), 671 F.2d 954, 958.

The defendant also argues that Ramos' grand jury testimony concerning a conversation he had with the defendant was inadmissible under section 115—10.1 on the ground that Ramos was not "subject to cross-examination" as to the grand jury testimony. He contends that Ramos' professed memory loss as to the content of the conversation he had with the defendant deprived defense counsel of an opportunity to cross-examine the witness concerning his prior testimony, and therefore its admission violated the confrontation clause of the sixth amendment to the Constitution of the United States.

The confrontation clause is not violated by admitting a declarant's out-of-court statements, as long as the declarant is testifying as a witness and subject to full and effective cross-examination. (*Delaware v. Fensterer* (1985), 474 U.S. 15, 20, 88 L. Ed. 2d 15, 19, 106 S. Ct. 292, 296; *California v. Green* (1970), 339 U.S. 149, 158, 26 L. Ed. 2d 489, 497, 90 S. Ct. 1930, 1935.) Contrary to the defendant's assertions, a gap in the witness' recollection concerning the content of a prior statement does not necessarily preclude an opportunity for effective cross-examination. See, *e.g., United States v. Owens* (1988), 484 U.S. 554, 98 L. Ed. 2d 951, 108 S. Ct. 838; *United States v. DiCaro* (7th Cir. 1985), 772 F.2d 1314, 1323; *United States v. Russell* (8th Cir. 1983), 712 F.2d 1256, 1258; *United States v. Murphy* (4th Cir. 1982), 696

F.2d 282, 284; 4 D. Louisell & C. Mueller, Federal Evidence §419, at 179-80 (1980).

The Supreme Court recently held in *United States v. Owens* (1988), 484 U.S. 554, 98 L. Ed. 2d 951, 108 S. Ct. 838, that the confrontation clause of the sixth amendment is not violated by the admission of testimony concerning a prior, out-of-court identification when the identifying witness is unable, because of memory loss, to explain the basis for the identification. In *Owens*, a correctional counselor at a Federal prison was attacked, and as a result of injuries suffered, his memory was severely impaired. Prior to trial, the counselor was interviewed in the hospital by an FBI agent and was able to describe the attack and identify his assailant from an array of photographs. At trial he testified to the circumstances surrounding the prior identification, but on cross-examination, he admitted that he could not remember seeing his assailant and could not recall talking with anyone in the hospital except the FBI agent.

In rejecting the defendant's argument that his sixth amendment right to confrontation was violated because of the witness' memory loss, the Court stated:

" '[T]he Confrontation Clause guarantees only "an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.' " [Citations.] *** [O]pportunity is not denied when a witness testifies as to his current belief but is unable to recollect the reason for that belief. It is sufficient that the defendant has the opportunity to bring out such matters as the witness's bias, his lack of care and attentiveness, his poor eyesight, and even (what is often a prime objective of cross-examination, see 3A J. Wigmore, Evidence §995, pp. 931-932 (J. Chadbourn rev. 1970)) the very fact that he has a bad memory. If the ability to inquire into these matters suffices to establish the constitutionally requisite opportunity for cross-examination when a witness testifies as to

his current belief, the basis for which he cannot recall, we see no reason why it should not suffice when the witness's past belief is introduced and he is unable to recollect the reason for that past belief." (Emphasis in original.) 484 U.S. at 559, 98 L. Ed. 2d at 957-58, 108 S. Ct. at 842.

The Court also held that the witness was "subject to cross-examination" concerning the prior identification within the meaning of the phrase set out in Rule 801(d)(1)(c):

"It seems to us that the more natural reading of 'subject to cross-examination concerning the statement' includes what was available here. Ordinarily a witness is regarded as 'subject to cross-examination' when he is placed on the stand, under oath, and responds willingly to questions. Just as with the constitutional prohibition, limitations on the scope of examination by the trial court or assertions of privilege by the witness may undermine the process to such a degree that meaningful cross-examination within the intent of the rule no longer exists. But that effect is not produced by the witness's assertion of memory loss—which, as discussed earlier, is often the very result sought to be produced by cross-examination, and can be effective in destroying the force of the prior statement. Rule 801(d)(1)(c), which specifies that the cross-examination need only 'concer[n] the statement,' does not on its face require more." 484 U.S. at 561-62, 98 L. Ed. 2d at 959, 108 S. Ct. at 844.

The trial court did not err in admitting Ramos' grand jury testimony.

The defendant also contends that he was denied a fair trial by the State's intentional use of the allegedly perjured testimony of one of its witnesses, Victor Flores. The defendant claims that Victor Flores perjured himself at trial when he testified that he did not expect any consideration from the State in exchange for testifying against the defendant and that the State was aware that the testimony was perjurious at time of trial. He also ar-

gues that the State's failure to disclose the information prior to trial violated its obligation to disclose exculpatory information to the defense under *Brady v. Maryland* (1963), 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194.

The record shows that Flores testified that he had been arrested and charged with the murder of Perez. On cross-examination, he stated that although he had not made a "deal" with the State in exchange for his testimony, he "hope[d] to get some help from the State's attorney." Following conviction and sentencing, the defendant filed a motion on the ground of newly discovered evidence alleging that "the State had made a tentative agreement with the witness' attorney, Elliot Samuels, [and that the witness] was promised that his truthful testimony would be considered by the State in arriving at a future decision as to how to proceed on Victor Flores' pending case." The motion was denied and the defendant contends that the trial court erred in doing so.

To warrant a new trial based on the discovery of new evidence, the evidence must be of such conclusive character that it will probably change the result on retrial; it must have been discovered since the trial; and it must be of such character that it could not have been discovered prior to trial by the exercise of due diligence. *People v. Molstad* (1984), 101 Ill. 2d 128, 134; *People v. Baker* (1959), 16 Ill. 2d 364, 374.

Contrary to the defendant's assertions, we cannot say that Flores' testimony at trial was perjurious. The witness had not actually made a deal with the State in exchange for testifying against the defendant, and therefore, Flores' statements that he expected "help" from the State was not a misrepresentation. Too, it cannot be held there was a *Brady* violation, as the alleged information that was not disclosed was not so material that it

can be said that "had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley* (1985), 473 U.S. 667, 682, 87 L. Ed. 2d 481, 494, 105 S. Ct. 3375, 3384; *People v. Olinger* (1986), 112 Ill. 2d 324, 342.

Another contention the defendant makes is that he was denied a fair trial when the trial court excused five prospective jurors for cause after they expressed an unwillingness to impose the death penalty. The defendant claims that excusing these jurors in this manner, that is, pursuant to *Witherspoon v. Illinois* (1968), 391 U.S. 510, 20 L. Ed. 2d 776, 88 S. Ct. 1770, denied him his right to a jury drawn from a fair cross-section of the community and resulted in a conviction-prone jury. This court has repeatedly held that the qualification of jurors pursuant to *Witherspoon* does not deny a defendant the right to a jury drawn from a fair cross-section of the community (*People v. Johnson* (1986), 114 Ill. 2d 170; *People v. Neal* (1985), 111 Ill. 2d 180, 197), nor does it result in a conviction-prone jury (*People v. Collins* (1985), 106 Ill. 2d 237, 279; *People v. Gacy* (1984), 103 Ill. 2d 1, 37-38). The Supreme Court has also rejected a challenge to the qualification of jurors under *Witherspoon* on precisely the same grounds as the defendant now raises. See *Lockhart v. McCree* (1986), 476 U.S. 162, 90 L. Ed. 2d 137, 106 S. Ct. 1758.

The defendant argues too that the trial court erred in instructing the jurors, in advance of trial, that no transcripts would be made available for their use. In preliminary instructions to the jury as to courtroom procedure, the court stated:

> "Any evidence which is not sent back to you, there is a reason for it, so don't be looking for it. Just—police reports and so forth, sometimes jurors look for them. Those are hearsay, so they don't go back with you. Any documents that are not sent back there, there's a reason for

it. You'll have no transcripts, so you'll have to keep the collective minds of all 12 of you."

The defendant argues that the jury could have reasonably believed from the judge's remarks that the court was without discretion to permit them access to transcripts of witnesses' testimony. The defendant claims that this violated his due process right to have the jury accurately informed of the evidence.

Transcripts of testimony may be shown to the jury if the jury so requests and if the trial court, in its discretion, considers the transcripts will be helpful. (*People v. Olinger* (1986), 112 Ill. 2d 324, 349; *People v. Queen* (1974), 56 Ill. 2d 560, 565.) This court has held that when a court refuses to exercise discretion "in the erroneous belief that it has no discretion," and the requested testimony is material to the questions presented, the defendant is denied a fair trial. *People v. Pierce* (1974), 56 Ill. 2d 361; *People v. Queen* (1974), 56 Ill. 2d 560, 565; *People ex rel. Chesapeake & Ohio Ry. Co. v. Donovan* (1964), 30 Ill. 2d 178.

It is not entirely clear what the trial court meant in the quoted remarks. It could have meant that in the exercise of discretion it considered the transcripts would not be helpful. But if we agree with the defendant that the court's remarks should be construed as indicating that it was without discretion to furnish the jury with transcripts if requested, it must be noted, the State says that the defendant did not object to the court's remarks nor did he include the point in his motion for a new trial. The question has been waived. *People v. Collins* (1985), 106 Ill. 2d 237; *People v. Pickett* (1973), 54 Ill. 2d 280.

In any event, there is no evidence in the record that the jury requested transcripts. Too, even if the judge's remarks had a "chilling" effect on the jury's request for transcripts, as the defendant claims, from the record it can be seen that the evidence at trial was not compli-

cated, and consequently, it appears unlikely that the jury would require transcripts to help it in its deliberations. On this record it cannot be reasonably said that, even if the court did not consider it had discretion to make the transcripts available to the jury, the error had the effect of denying the defendant a fair trial. In light of this conclusion the defendant's contention that he was denied effective assistance of counsel by his counsel's failure to object to the court's instructions must be rejected.

The defendant also argues that he was denied a fair trial by remarks made by the prosecutor during closing argument. He complains of the following comments by the prosecutor:

"Nancy Lebron corroborates the statement and the testimony that Victor Flores gave from that witness stand. The testimony that Victor Flores gave from that stand is unrebutted. There's nothing in this trial that has called him a liar or said he was wrong. On the other hand, he has been totally and absolutely corroborated in what he said—as I just said, by Nancy Lebron, what happened at the accident scene. She saw it exactly the way Victor testified to it."

We do not accept the defendant's argument that the prosecutor's remarks amounted to comment on his failure to testify, and also impermissibly shifted the burden of proof.

In context, the prosecutor's remarks cannot unreasonably be considered as a comment on defense counsel's attempt to call into question the credibility of Victor Flores by pointing out that his testimony was not contradicted. Defense counsel had attacked the witness' credibility by arguing that he was lying to save himself from being prosecuted. The credibility of witnesses is a proper subject for closing argument if it is based on the facts in the record or inferences drawn from those facts. (*People v. Bryant* (1983), 94 Ill. 2d 514, 523-24; *People v.*

*Wallace* (1981), 100 Ill. App. 3d 424, 432.) The State may argue that its case is uncontradicted, "for this involves no more than an accurate summary of the evidence." (*People v. Hopkins* (1972), 52 Ill. 2d 1, 6.) This is true even if the only one who could contradict the State's evidence is the defendant. (*People v. Mills* (1968), 40 Ill. 2d 4; *People v. Birger* (1928), 329 Ill. 352.) Even if the remarks did give an improper impression to the jury, it was cured when the jury was properly instructed by the trial court on the State's burden of proof. We cannot say that the prosecutor's remarks had the effect of denying the defendant a fair trial. As this court put it in *People v. Baptist* (1979), 76 Ill. 2d 19, 29, "improper remarks generally do not constitute reversible error unless they result in substantial prejudice to the accused." See also *People v. Tiller* (1982), 94 Ill. 2d 303, 321.

The defendant's next contention is that his armed robbery conviction must be vacated on the ground that no sentence was ever entered upon the conviction. While it is axiomatic that there is no final judgment in a criminal case until the imposition of sentence, and, in the absence of a final judgment, an appeal cannot be entertained (*People v. Caballero* (1984), 102 Ill. 2d 23, 51; *People v. Dixon* (1982), 91 Ill. 2d 346, 352; *People v. Warship* (1974), 59 Ill. 2d 125, 130; *People v. Lilly* (1974), 56 Ill. 2d 493, 496), it does not follow, however, that the conviction must be vacated. It simply means that there can be no appeal of it. The appeal will be dismissed as to the defendant's conviction of robbery.

We judge that there was no reversible error during the guilt phase of the trial, and accordingly, we affirm the defendant's conviction for murder.

The defendant also contends there was error in his sentencing proceeding. The defendant's first argument is that since the armed robbery conviction is not before this court for review, and the armed robbery served as

the predicate making him subject to the death penalty under section 9—1(b)(6) of the Criminal Code (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(b)(6)), the death sentence must be vacated. We disagree.

Section 9—1(b)(6) provides:

"A defendant *** who has been found guilty of murder may be sentenced to death if:

\* \* \*

6. the murdered individual was killed in the course of another felony if:
    (a) the murdered individual:
        (i) was actually killed by the defendant ***

\* \* \* and

    (b) in performing the acts which caused the death of the murdered individual *** the defendant acted with the intent to kill the murdered individual or with the knowledge that his acts created a strong probability of death or great bodily harm to the murdered individual or another; and
    (c) the other felony was one of the following: *** armed robbery ***." Ill. Rev. Stat. 1985, ch. 38, par. 9—1(b)(6).

The defendant's argument fails to consider that it is the evidence at trial and at sentencing establishing that the murder was committed in the course of an armed robbery that subjects the defendant to the death penalty under section 9—1(b)(6), and not the conviction itself. Indeed, the armed robbery need not have been completed to make the defendant subject to the death penalty under the statute. See *People v. Ramirez* (1983), 98 Ill. 2d 439, 458.

The defendant also contends that the evidence was insufficient to subject him to the death penalty under section 9—1(b)(6) in that it did not show that the victim was murdered in the course of armed robbery. The defendant says because the record shows that the victim was killed instantly from a shotgun blast and that the victim's pos-

sessions were taken thereafter, that no "force" was involved in taking the victim's possessions. He argues also that there is nothing in the record suggesting an intent to rob the victim before he was killed. The defendant says the intent to rob was simply an unrelated afterthought.

It is true that armed robbery is the taking of property from the person or presence of another by the use of force or by threatening the imminent use of force while armed with a dangerous weapon. (Ill. Rev. Stat. 1985, ch. 38, par. 18—2.) It is of no significance here, however, that the armed robbery did not commence prior to the fatal gunshots to subject the defendant to the death penalty under section 9—1(b)(6). As this court stated in *People v. Richardson* (1988), 123 Ill. 2d 322, 359:

> "Just as the phrase 'in the course of' does not require that defendant complete one of the other felonies in order to be eligible for the death sentence [citation], we also believe that it does not require that the armed robbery commence prior to the fatal gunshot, since the precise timing of the offenses is not necessarily indicative of defendant's intent. The jury concluded beyond a reasonable doubt that defendant committed both a murder and an armed robbery, which offenses occurred essentially simultaneously. The trial testimony and verdicts sufficiently support the court's finding that the murder occurred 'in the course of' an armed robbery."

We cannot say that the jury's conclusion that the defendant was subject to the death penalty under section 9—1(b)(6) was contrary to the manifest weight of the evidence. *People v. Griffin* (1985), 109 Ill. 2d 293, 303.

The defendant next argues that the trial court erred in failing to question the jury following the receipt of a note at trial in which the jurors expressed their apprehension that security in the courtroom was inadequate. The record shows that the jury sent a note with the ver-

dicts finding the defendant guilty. The note does not appear in the record, but the court summarized it remarking that the jurors wanted "to know about security." Prior to sentencing hearing, the court brought the jurors into chambers and the following colloquy took place:

"THE COURT: *** As I said to you before, all of the jurors for some reason—maybe, it is because of what you saw in a movie or on television or read in a newspaper; you are worried about security. I never heard about anything happening to any juror in the course of my entire life, and I'm sure because gangs came up here, some of you have some fears.

I assure you, the—the security is extremely good as far as the building is concerned and walking to your cars and if anyone wants to walk to their car, don't worry about it. It is an ill-founded fear. I'm sure, you are going to say, oh, sure, you can say that. I assure you, it is a very ill-founded fear.

* * *

Do any of you have any other problem ... about the security? As I say, some of you may have some fears because you are not used to it. I'm used to it. I have been here every day. The three attorneys are here, and I assure you that they don't want anything to—to put any fear in you, and I don't want you going home tonight and if you see some Latino in your neighborhood say, oh, somebody is after me. I assure you, don't worry about it.

So, don't have any fear about the security.

A JUROR: Okay.

THE COURT: All right. And the sheriffs will walk you down and walk you to your cars and everything else. It is an ill-founded fear. All right?

All right."

The defendant argues that the court's remarks were insufficient to relieve the jurors' fears. He complains that the court should have questioned the jurors further, and if indicated, ordered the jury to be sequestered. The defendant did not, however, object at the time, nor was

it alleged as error in his motion for a new trial. As stated, any claims of error not objected to at trial or included in a post-trial motion are waived. (See *People v. Collins* (1985), 106 Ill. 2d 237; *People v. Precup* (1978), 73 Ill. 2d 7; *People v. Pickett* (1973), 54 Ill. 2d 280.) In any event, we find no error in the court's not questioning the jurors further or not ordering that the jury be sequestered. As the record shows, the jury stated that they were no longer concerned about security, and therefore, granting the defendant's request would serve no purpose. No further action by the attorney was necessary and we reject the defendant's contention that defense counsel was incompetent in failing to object.

The defendant next contends that the trial court abused discretion in refusing to question the jury concerning a newspaper article which appeared in a local paper prior to the start of the sentencing hearing. Defense counsel brought the article to the attention of the court, stating:

"There was an article which appeared last Friday in the Chicago Tribune in which there are some remarks in here which I believe are prejudicial to my client. One of these remarks, the mother of the deceased Anna Rodriguez states on Wednesday, Flores' mother asked Anna Rodriguez, the victim's mother, to join her for coffee. The invitation was rejected, said a friend who had come to court to translate for Mrs. Rodriguez. To take coffee is to take coffee with the devil.

The last paragraph says by Detective Guevara, I've been shot at and ambushed, as he watched the families leave the courtroom. This is the stuff that bothers me. It leaves an inference that maybe somebody related to this case or Flore's family has ambushed or shot at him.

I am asking the Court to request of the jurors if any of them read this article and if they feel in any way this article would prejudice this Defendant and this sentencing hearing. I believe it would, Judge."

The court, over defense counsel's objection, refused to question the jury concerning the article.

Whether to inquire of a jury concerning an allegedly prejudicial news article rests in the sound discretion of the trial court. (*People v. Marmon* (1945), 389 Ill. 478, 483; *People v. Mangano* (1933), 354 Ill. 329.) We find no abuse of discretion here in the trial court's refusal to question the jury concerning the article. The defendant failed to present the article to the trial court and therefore the court was precluded from properly evaluating its prejudicial content. (*People v. Hamilton* (1981), 100 Ill. App. 3d 942, 956; *People v. Cordova* (1980), 83 Ill. App. 3d 147.) Too, there was no evidence that any of the jurors had read the article, and therefore, bringing the article to the attention of the jury may have done more harm than good. Absent evidence to the contrary, we will not presume that the defendant was prejudiced by the article. See *People v. Harrison* (1943), 384 Ill. 201, 207; *People v. Herbert* (1930), 340 Ill. 320, 324.

The defendant contends too that the death sentence should be vacated because it is a disproportionate and excessive penalty. He states that there are mitigating factors which should preclude imposition of the death penalty. Specifically, the defendant argues that his youth, 19 years, his potential for rehabilitation and absence of significant history of criminal activity militate against the death penalty. We disagree.

The record shows that the victim was brutally, and in cold blood, shot repeatedly at point-blank range. The defendant was not without a significant criminal history, as shown by his juvenile adjudications and the testimony of Louis Rosero. Though there is evidence that the defendant is an accomplished athlete and has shown willingness to help other inmates while in prison, factors such as those do not preclude imposition of the death

penalty. (*People v. Sanchez* (1986), 115 Ill. 2d 238, 275; *People v. Brownell* (1980), 79 Ill. 2d 508, 538.) Given the record of extreme aggravation and the scant evidence in mitigation, it cannot be said that the imposition of the death penalty here is not commensurate with the gravity of the offense and the character of the defendant. *People v. Sanchez* (1986), 115 Ill. 2d 238, 274; *People v. Free* (1983), 94 Ill. 2d 378, 428-29.

The defendant also raises a number of challenges to the constitutionality of our death penalty statute. Although the defendant acknowledges that this court has rejected these contentions, he argues that we should reconsider its holdings, but offers no new arguments. We decline the defendant's invitation and reaffirm those decisions.

This court has rejected claims of unconstitutionality on the ground that the statute provides inadequate pretrial notice of the aggravating circumstances that the State intends to use at the sentencing hearing (*People v. Albanese* (1984), 104 Ill. 2d 504, 540-41; *People v. Davis* (1983), 95 Ill. 2d 1), or because it does not require the sentencing body to specify in writing the aggravating factors upon which the death sentence was based (*People v. Albanese* (1984), 104 Ill. 2d 504, 540-41). This court has also held that the statute does not allow unbridled or unguided discretion to the prosecution in deciding whether or not a capital sentencing hearing shall be held (*People ex rel. Cary v. Cousins* (1979), 77 Ill. 2d 531), and that the structure of the death penalty act does not place the burden of proof on the defendant to establish mitigating circumstances sufficient to preclude imposition of the death penalty (*People v. Sanchez* (1986), 115 Ill. 2d 238, 268-69; *People v. Williams* (1983), 97 Ill. 2d 252, 265).

It has also been held that the statute is not unconstitutional because the jury is not informed of its ability to

afford the defendant mercy or sympathy even when no mitigating factors are found. (*People v. Stewart* (1984), 104 Ill. 2d 463.) Our death penalty statute mandates that the sentencing body may consider any mitigating factors which are relevant to the imposition of the death penalty. (See Ill. Rev. Stat. 1985, ch. 38, par. 9—1(c).) This court has acknowledged that mercy is a relevant mitigating factor for consideration at a capital sentencing hearing, but it is to be considered within the context of all factors in aggravation and mitigation. (*People v. Hall* (1986), 114 Ill. 2d 376; *People v. Holman* (1984), 103 Ill. 2d 133, 170.) There is no constitutional requirement, however, that the jury be instructed that "mercy" can be a valid mitigating factor. This constitutional issue was considered and resolved against the defendant by the Supreme Court in *California v. Brown* (1987), 479 U.S. 538, 93 L. Ed. 2d 934, 107 S. Ct. 837. There, the Court held that an instruction informing jurors that they "must not be swayed by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling" during the penalty phase of a capital murder trial does not violate the eighth and fourteenth amendments to the Constitution of the United States. Our decisions are in accord. (*People v. Del Vecchio* (1985), 105 Ill. 2d 414, 445.) This court has also held that there is no unconstitutional vagueness in the statutory provision that the absence of a "significant history of prior criminal activity" (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(c)(1)) is a mitigating factor. See *People v. Williams* (1983), 97 Ill. 2d 252, 265; *People v. Lewis* (1981), 88 Ill. 2d 129, 144-46.

For the reasons given the judgment of the circuit court in appeal number 62398 is affirmed as to the defendant's murder conviction and death sentence and dismissed as to the conviction for armed robbery. We now turn to the defendant's appeal from the denial of

his petition for relief under the Post-Conviction Hearing Act in appeal number 65105.

At a hearing under the Post-Conviction Hearing Act, the burden is on the defendant to establish a substantial deprivation of rights under the United States Constitution or the Constitution of Illinois (*People v. Griffin* (1985), 109 Ill. 2d 293, 303; *People v. Moore* (1975), 60 Ill. 2d 379, 384), and determinations by the trial court will not be disturbed unless contrary to the manifest weight of the evidence (*People v. Griffin* (1985), 109 Ill. 2d 293, 303; *People v. Bracey* (1972), 51 Ill. 2d 514).

The defendant's principal contention of error is that he was denied effective assistance of counsel at both the guilt and sentencing stages of his trial in violation of the sixth amendment to the Constitution of the United States. He argues that defense counsel was incompetent for failing to interview or call several witnesses who would have testified to the defendant's whereabouts on the night of the murder of Perez. He makes the same assertion as to other witnesses who would have provided the defendant an alibi for the shooting of Louis Rosero that the State presented in aggravation at sentencing. He says he furnished defense counsel the names of the witnesses but counsel refused to interview them. The defendant also asserts that counsel was incompetent in refusing to permit him to testify at trial or at sentencing regarding the alibi the witnesses would have testified to, though he expressed a desire to do so.

At a hearing on the defendant's petition, the defendant's sisters, Lena, Anita and Graciela Flores, and his parents, Ramora and Anna Flores, testified that on the evening of December 31, 1983, they were with the defendant and Virginia, Elisio and Ludi Villareal, celebrating New Year's Eve at their home. Lena Flores stated that the Villareals left at approximately 2 a.m., and that the members of her family, including the

defendant, went to sleep at approximately 4 a.m. Lena also stated that she told attorney Howard Gilman, who originally represented the defendant until Gilman's death in January of 1985, and Michael Johnson, who represented the defendant thereafter and at trial, that her family would testify to the defendant's whereabouts on the night of Perez' murder. Lena testified that she also told Gilman and Johnson that Nick, Noel and Natilie Francis would testify that the defendant was with them at the time Louis Rosero was purportedly shot. Neither Gilman nor Johnson, according to Lena Flores, interviewed her or the other members of the family concerning their testifying. Anita and Graciela Flores stated that they also told Johnson that they would testify that the defendant was with them the entire evening of December 31, 1983, and that members of the Francis family would testify that the defendant was with them at the time Rosero was allegedly shot.

Nicholas, Noel and Natilie Francis testified that the defendant was with them the entire evening of August 4, 1984, until the following morning when he and Nick attended a swim meet. They also stated that no one had contacted them to testify on behalf of the defendant. The defendant's testimony substantially corroborated the statements of the members of his family and the Francises' statements.

Attorney Michael Johnson testified that he was in constant contact with members of the defendant's family prior to trial and that they informed him what they would testify to concerning the defendant's whereabouts on the night Perez was murdered. Johnson also stated that Gilman told him that Nick and Noel Francis would testify that the defendant was with them at the time Rosero was allegedly shot. Johnson further testified that he did not call members of the defendant's family because he considered that the proposed testimony would not be

helpful in view of conflicting admissions the defendant had made and that his strategy was to rely on the premise that the prosecution had failed to prove the defendant guilty beyond a reasonable doubt.

At the conclusion of the hearing, the circuit court denied the defendant's petition, stating that the defendant was not denied effective assistance of counsel at trial.

Contrary to the defendant's contention, the record clearly shows that defense counsel's decision not to call members of the defendant's family was not the result of a lack of diligence in adequately preparing for trial, but the result of trial strategy. The defendant's sisters testified that defense counsel spoke with them and that he was aware of what their testimony would be. Defense counsel was also aware that members of the Francis family would provide the defendant an alibi for the shooting of Louis Rosero.

The facts here are therefore clearly distinguishable from the decisions the defendant cites in which defense counsel's refusal to call witnesses who may have aided the defendant's defense was a result of negligence or lack of due diligence. (See *United States ex rel. Cosey v. Wolff* (7th Cir. 1984), 727 F.2d 656; *Eldridge v. Atkins* (8th Cir. 1981), 665 F.2d 228; *Caraway v. Beto* (5th Cir. 1970), 421 F.2d 636.) Nothing in the record suggests that defense counsel's failure to call the witnesses was the result of failure to investigate, neglect or incompetence. It was clearly a decision related to a trial strategy.

Johnson stated that he decided not to call members of the defendant's family to testify after discussions with the defendant and members of his family revealed that the proposed alibi was unreliable. Johnson testified that the defendant gave him conflicting accounts as to his whereabouts on the night Perez was murdered. According to Johnson, the defendant had told him at one time that he was not involved in the murder, as he was not

present; that he was at the scene of the accident but left before the shooting; and at another time that Victor Flores or Harry Gomez shot the victim while he was present.

Johnson testified also that the defendant's purported alibi was inconsistent with statements he gave the police following his arrest. Indeed, Jeremiah Lynch, a former assistant State's Attorney, testified at the post-conviction hearing that on November 10, 1984, he took a statement from the defendant following his arrest for the murder of Perez. The defendant stated that he was home with his mother, father, three sisters and brother until midnight on New Year's Eve. He could not, however, recall where he was after midnight or whether he was with Victor Flores or Harry Gomez at that time. The defendant's written statement to the same effect was introduced into evidence at the hearing.

This court stated in *People v. Madej* (1985), 106 Ill. 2d 201, 214, that the decision to call particular witnesses is a matter of trial strategy, and that defense counsel need not call a witness if he reasonably believes that under the circumstances the individual's testimony is unreliable or would likely have been harmful to the defendant. (See also *People v. Ashford* (1988), 121 Ill. 2d 55, 74-75; *Eldridge v. Atkins* (8th Cir. 1981), 665 F.2d 228, 236 n.5.) As stated, an ineffective-assistance-of-counsel claim which arises from a matter of defense strategy will generally not support a claim of ineffective representation. *People v. Madej* (1985), 106 Ill. 2d 201, 214.

Upon reviewing the testimony, we are unable to say that counsel's not calling members of the defendant's family denied him effective assistance of counsel. Defense counsel reasonably could have concluded that the testimony of the members of the defendant's family was unreliable, and also might have had good reason to doubt

the veracity of the testimony in light of what the defendant told defense counsel.

In *Nix v. Whiteside* (1986), 475 U.S. 157, 89 L. Ed. 2d 123, 106 S. Ct. 988, the Supreme Court stated that the sixth amendment right of a criminal defendant to assistance of counsel is not violated when an attorney refuses to cooperate with the defendant in presenting perjured testimony at trial. Confronted with the contradictions between what the members of the defendant's family would testify to and what defendant himself had told counsel, he could reasonably have concluded that the presentation of this testimony would have been improper on his part. He also might have concluded that presentation of such testimony ran the risk of destroying the defendant's credibility if the witnesses' testimony was shown unreliable under cross-examination.

The defendant argues, however, that unless defense counsel had actual knowledge that the testimony was perjurious, his mere suspicion is insufficient grounds to refuse to call an alibi witness. We disagree, as defense counsel should have discretion to make a good-faith determination whether particular proposed witnesses for the defendant would testify untruthfully. Absent some showing that counsel's decision was unreasonable under the circumstances, we cannot say that the defendant was denied a fair trial as a consequence of counsel's election not to call the members of his family to present an alibi. For the same reason, defense counsel was not incompetent in refusing to permit the defendant to testify to the purported alibi.

It must be borne in mind also that counsel's performance must be evaluated on the basis of the entire record, and not upon isolated instances of alleged incompetence called into question by the defendant. (*People v. Hills* (1980), 78 Ill. 2d 500.) From the record it is clear that the defendant received effective assistance of counsel

throughout the guilt phase of the trial. He conducted vigorous cross-examination of the State's witnesses, raised numerous objections, presented witnesses and made a full and spirited closing argument.

The defendant further claims that defense counsel was ineffective in failing to call as witnesses in mitigation Noel, Nick and Natilie Francis, who purportedly would have testified that the defendant was at home with them at the time Louis Rosero was allegedly shot. Johnson testified that he did not call the Francises to testify on the ground that although the defendant had never admitted involvement in the shooting, he had made statements which led Johnson to believe that the alibi was unreliable. He also said that statements by the defendant following his arrest for the shooting indicated that the alibi was unreliable.

Michael O'Grady, a Chicago police officer, testified that he took a statement from the defendant on August 6, 1984. After advising the defendant of his rights under *Miranda*, the defendant stated that on August 5, 1984, at approximately 12:45 a.m., about the time Rosero was shot, he was at the Francis home with, among others, Victor Flores.

The Francis family members testified, however, that only their family and the defendant were present at their home on the evening of August 4, 1984.

Evidence presented at the post-conviction hearing also established that they were uncertain as to the date when Rosero was shot. In a statement given to a defense investigator prior to trial, which was introduced at the post-conviction hearing, Natilie, Nick and Noel Francis stated that the defendant was at their home on the night of August 5, a day after Rosero was shot.

The defendant's testimony at the post-conviction hearing was also inconsistent with the witnesses' proposed testimony. The defendant testified that he was

with the Francises at their home on the night of August 4–5, 1984, and that he left the following morning at 8 a.m. to attend a swimming and diving competition. He stated that he had known Nick and Noel for about a year and that Nick was not a diver or swimmer. Nicholas testified that he and the defendant, who were both swimmers, attended a swim meet the next day.

Given the various contradictions in the testimony of the defendant and the Francises, and the fact that the victim testified at sentencing that it was the defendant who shot him, we cannot say that the defendant was denied effective assistance of counsel by the failure to call them to testify to the purported alibi.

The defendant also asserts that he was denied effective assistance of counsel because defense counsel simultaneously represented one of the State's witnesses, Sammy Ramos, and Harry Gomez. This argument was rejected as to the alleged concurrent representation of Ramos in the defendant's direct appeal, and since the defendant has presented no additional evidence on this issue it will not be considered further. See *People v. Kubat* (1986), 114 Ill. 2d 424, 436.

As to counsel's claimed representation of Harry Gomez, who was not a witness for the State, the trial court found that counsel did not concurrently represent the defendant and Gomez. Gomez was not indicted until after the defendant's trial. We see no conflict which would render counsel's performance ineffective.

Finally, the defendant argues that counsel was incompetent for failing to argue during sentencing that the evidence was insufficient to prove that the homicide was committed during an armed robbery. As stated, however, the evidence at trial and sentencing was sufficient to show that the victim was murdered in the course of an armed robbery. Thus, the defendant's argument is uncon-

vincing, as it cannot be said 'that if counsel had made the argument, that it would have changed the result.

We hold that the trial court correctly dismissed the defendant's petition for post-conviction relief.

For the reasons given, the judgment of the circuit court of Cook County is affirmed in appeal number 62398 as to his murder conviction and sentence of death and dismissed as to the conviction of armed robbery. The judgment of the circuit court in appeal number 65105 is affirmed. The clerk of this court is directed to enter an order setting Wednesday, May 10, 1989, as the date on which the sentence of death entered in the circuit court of Cook County is to be implemented. The defendant shall be executed by lethal injection in the manner provided by section 119—5 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1985, ch. 38, par. 119—5). A certified copy of the mandate of this court shall be transmitted by the clerk of this court to the Director of Corrections, to the warden of Stateville Correctional Center, and to the warden of the institution wherein the defendant is confined.

*No. 62398 — Affirmed in part;*
*dismissed in part.*
*No. 65105 — Affirmed.*

JUSTICE CALVO took no part in the consideration or decision of this case.