# Illinois Official Reports

## Appellate Court

---

### *People v. Hoffman*, 2020 IL App (2d) 180853

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Petitioner-Appellee, v. DAVID JOHN HOFFMAN, Respondent-Appellant. |
| District & No. | Second District<br>No. 2-18-0853 |
| Rule 23 order filed<br>Motion to<br>publish allowed<br>Opinion filed | February 10, 2020<br><br>March 17, 2020<br>March 17, 2020 |
| Decision Under Review | Appeal from the Circuit Court of Du Page County, No. 16-CC-23; the Hon. John J. Kinsella, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | James E. Chadd, Thomas A. Lilien, and Kerry Goettsch, of State Appellate Defender's Office, of Elgin, for appellant.<br><br>Robert B. Berlin, State's Attorney, of Wheaton (Lisa Anne Hoffman, Assistant State's Attorney, of counsel), for the People. |

JUSTICE HUDSON delivered the judgment of the court, with opinion.
Justices Schostok and Bridges concurred in the judgment and opinion.


**OPINION**

¶ 1    Respondent, David John Hoffman, was found guilty in a domestic battery case and, in a separate proceeding, admitted to indirect criminal contempt of court. On appeal, he contends that the trial court abused its discretion by making the contempt sentence and the domestic battery sentence consecutive. We conclude that no abuse of discretion occurred, and we therefore affirm.

¶ 2                                I. BACKGROUND
¶ 3                              A. Domestic Battery
¶ 4    On March 24, 2016, a grand jury indicted Hoffman on two counts of domestic battery, which were charged as Class 3 felonies because Hoffman had three prior convictions of the offense (720 ILCS 5/12-3.2(a)(1), (a)(2), (b) (West 2016)). Each count alleged that, on March 5, 2016, Hoffman struck J.B., a "household or family member," "in the face." On March 6, 2016, the trial court entered an order requiring, as a condition of his possible release on bond, that he have no contact with J.B. Hoffman did not post bond and was not released.

¶ 5    At Hoffman's trial, J.B. testified that she had been dating Hoffman since September 2010. She loved Hoffman and had been trying to help him beat the charges, so she was unhappy that she had to testify against him. She also described feeling pressure from him to help with his defense, but she did not testify that he explicitly pressured her. J.B. testified that Hoffman struck her in the face with his hand, causing a visible lump to form on the left side of her jaw. However, on cross-examination, she agreed that, in interviews with an investigator for the public defender and with two assistant state's attorneys, she had claimed that she had hit herself in the face with a car door. She confirmed that Hoffman, after his arrest, had been in constant contact with her and had called her cell phone about 100 times.

¶ 6    The State introduced recordings of some of Hoffman's calls from jail, which are not part of the record on appeal. J.B. identified the voices of Hoffman and his friend, Steve Whitney, in several calls in which Hoffman was asking Whitney to convey messages to J.B. J.B. also confirmed that Hoffman had called her by other names in some calls, to conceal her identity.

¶ 7    The trial court permitted the State to introduce evidence of prior acts of domestic violence by Hoffman, as substantive evidence. On January 22, 2011, Hoffman beat J.B. and threw her clothing into the backyard of his house. He punched her in the mouth because she was using her phone to talk to her ex-husband.

¶ 8    On April 27, 2011, J.B. was awakened by Hoffman's holding her by her hair and punching her. He told her that "he was going to kill [her], punch [her] lights out." Photographs taken after that incident showed bruising on her face, upper body, and legs.

¶ 9    On December 4, 2011, J.B. was making dinner for herself and Hoffman. Hoffman threw the food away. J.B. started cooking again, and Hoffman "sucker punched" her, knocking her to the floor. The two scuffled; J.B. defended herself by throwing eggs, but Hoffman punched

her again. When she retreated to a corner, he pulled her hair, struck her repeatedly in the face, kicked her, and "stomped on" her. She fled to the basement. He followed and continued to strike her. He locked her in the basement. When she knocked on the door, he opened it and kicked her down the stairs. He later pushed her down the stairs again.

¶ 10 On December 6, 2011, Hoffman attacked J.B. while she was at his house. He smashed her phone and began chasing her. As she left by the back door, he punched her, bloodying her nose. She went back to the door to retrieve her phone. He threw the phone out the door, exited the house, and punched her again. J.B. then went to her home and sought treatment for her injuries. Among other things, she was experiencing severe back pain as a result of "falling down the stairs." J.B.'s daughter called the police, but J.B. told the investigating officer that she "got jumped," thus falsely implying an unknown assailant.

¶ 11 On July 2, 2012, Hoffman again "beat [her] up." On July 3, 2012, he "[s]tarted beating her up." He kicked her, threw her on a bed, and tried to smother her with a pillow.

¶ 12 On May 15, 2012, while an order of protection requiring that Hoffman have no contact with J.B. was in effect, the police recorded an emergency call in which Hoffman could be heard repeatedly saying, "I'm going to kill you," and J.B. could be heard screaming at him to "stop it." When the police responded to the call, they found J.B. hiding in an attic that was accessible only by a ladder. She had hidden because she wanted to protect Hoffman. The police observed that J.B.'s hair was falling out in clumps. She claimed at the time that the hair loss was the result of an illness but testified at trial that Hoffman's pulling her hair was the actual cause.

¶ 13 The State presented additional evidence of injuries that Hoffman inflicted on J.B. The defense rested without presenting evidence. A jury found Hoffman guilty of both charges.

¶ 14                                    B. Indirect Criminal Contempt

¶ 15 On March 12, 2016, while Hoffman was awaiting trial on the domestic battery charges, the State represented to the trial court that Hoffman, while in custody, had initiated more than 50 phone conversations with J.B. Hoffman had been in repeated contact with Whitney and had directed him to deliver messages to J.B. Among other things, Hoffman had told Whitney to remind J.B. of "their favorite" Three Stooges movie featuring "Duck, Dodge, and Hide." Further, Hoffman, apparently trying to hide his contacts with J.B., had started referring to her as "Susan" or "Cindy." The State contended that these communications were a violation of the March 6, 2016, order setting out additional conditions of bond. It asked the court to restate the prohibition, and the court did so:

> "THE COURT: *** *** Do you understand that I'm ordering you not to have any contact with [J.B.] at all, through yourself or anyone else? And if you do and it's proven to me, I'll find you in contempt, and you'll be punished for that act.
>
> Do you understand that?
>
> [HOFFMAN]: Yes."

¶ 16 On May 18, 2016, the State filed a petition for indirect criminal contempt of court against Hoffman. It alleged that, "[o]n May 14, 2016, [Hoffman] knowingly defied [the] Court's order by making contact with [J.B.] by calling [his own home phone number] and speaking to her from a recorded jail phone."

"During the phone call, [Hoffman] pleaded with [J.B.], saying 'help, help' when [J.B.] interrupted and said '[n]o, you need to help me.' [Hoffman] one more time stated 'help' and the call was then terminated."

¶ 17   On June 21, 2016, after the trial, the State filed four more counts of indirect criminal contempt of court based on Hoffman's continued attempts to contact J.B. from jail. The State agreed to drop the new counts in exchange for Hoffman's admission to the May 18, 2016, petition.

¶ 18   The court accepted the agreement and admonished Hoffman that he "could be sentenced for a term in the penitentiary *** to be determined by this Court without regard to any particular minimum or maximum."

¶ 19                                        C. Sentencing

¶ 20   At the combined sentencing hearing for the domestic battery case and the contempt case, the State introduced evidence of Hoffman's violence toward C.R., a woman he dated before his relationship with J.B. C.R. told a Villa Park police officer that Hoffman had pushed her out the back door of his house, causing her to fall and injure her wrist. The State filed domestic violence charges against Hoffman but later dismissed them.

¶ 21   Sergeant William Lyons, a detective with the Villa Park Police Department, testified that he had interviewed witnesses in several of the cases against Hoffman. C.R. reported that Hoffman had threatened to kill her; "[C.R.] was scared *** of him at that time and currently still is." Further, Hoffman had implied that he wanted C.R. to decline to cooperate with the prosecution so that the State would drop the charges. Lyons spoke to J.B. about a letter dated October 3, 2012, that she had dictated, signed, caused to be notarized, and sent to her employer. According to the letter, J.B. had missed work for two weeks because Hoffman had confined her to his house without a phone. J.B. told Lyons that the letter was accurate.

¶ 22   Whitney told Lyons and another officer that he had functioned as a messenger between Hoffman and J.B. He knew that the court had ordered Hoffman not to communicate with J.B.

¶ 23   A supervisor from the jail testified that she had investigated an inmate's anonymous complaint about Hoffman: Hoffman had been trying to borrow other inmates' telephone personal identification numbers (PINs) to disguise the source of his calls. The supervisor learned that calls had been made to J.B.'s phone number using at least one other inmate's PIN, but none of the calls reached anyone.

¶ 24   Valerie Phrysokos, J.B.'s sister, testified that J.B. had obtained a firearm owner's identification card because Hoffman wanted her to buy a gun for him. However, because Hoffman was a felon, she was afraid that she would face criminal charges if she bought a gun for him, so she never bought one. J.B. also told Phrysokos about an incident in February 2016 in which Hoffman stomped on her legs. Finally, Phrysokos had also learned that, not long before the July 2011 incident, Hoffman had persuaded J.B. to commit suicide with him. Hoffman left a car running in his garage. He and J.B. went into the garage together, but he exited and locked her inside. J.B. escaped by breaking a window, but Hoffman confronted her and struck her.

¶ 25   Hoffman's presentencing report showed that he had six convictions related to domestic violence, including domestic battery, violation of domestic battery bail bonds, and a violation of an order of protection. He had been imprisoned for one domestic battery conviction. He had

- 4 -

10 more related arrests without convictions for domestic batteries, violations of orders of protection, and violations of domestic battery bail bonds. According to the State, Hoffman had victimized four women in these incidents: J.B., C.R., and, in earlier incidents, Hoffman's ex-fiancée, D.S., and Hoffman's ex-wife, E.H, who had obtained an order of protection in 1998.

¶ 26    The trial court noted that it considered Hoffman's contacts before its March 12, 2016, no-contact order and his effort to persuade J.B. not to testify to be "very grave aggravation." Hoffman objected to the suggestion that a violation of the conditions of bond could be treated as aggravating, arguing that, although no contact with J.B. was a condition of his bond, nothing indicated that the court had apprised him of that condition.

¶ 27    In his statement in allocution, Hoffman said that he loved J.B. "dearly" and that their problems were the product of their alcoholism. He entreated the court, "[P]lease, give me and J.B. a chance to straighten this thing out, get our feet back on the ground, and be productive citizens again."

¶ 28    The trial court found the case "bizarre." Because neither Hoffman nor J.B. were capable of change, the court found imprisonment was the only way to protect J.B. and the public generally from Hoffman's impulse to beat people unable to fight back:

> "Well, this is an astonishing case. The facts are just astonishing and mind boggling, frankly, the fact that this relationship is as both [J.B.] and [Hoffman] describe is—each of them say they love each other.
>
> * * *
>
> From *** my calculations, you have been arrested a total of *** 27 times.
>
> You have been convicted in 12 of those cases, and 8 of those were domestic battery or battery related, and you had another 15 arrests that did not result in a prosecution, 11 of which involved battery, domestic battery, or domestic violence or violations of orders of protection.
>
> The Villa Park Police Department, according to my calculations, in the matter of just a few years, has had to arrest you 21 times.
>
> *** [T]he fact that you have generated that much time, attention, and energy, which cannot be spent doing something else more productive to keep you from killing this woman, who refuses to break off a relationship with you, it's *** just mind boggling.
>
> As far as the *** the contempt, *** when the State advised me that you had been in contact with her, in violation of the earlier court order, and I made it very clear to you that it would not be tolerated, and there would be severe and definite consequences, if you chose to violate the Court's order, and you did.
>
> * * *
>
> You called there, knowing she was going to answer the phone ***; and that is also gravely aggravating because you attempted to *** keep her from appearing in this courtroom and testifying against you.
>
> * * *
>
> It's insanity. You are going to get out, and you are going to probably go back to [J.B.] ***

I don't know what that says about her or about you, but I have the interests of the community, and no police officer in Villa Park should have to constantly go to your house to save her from being beaten by you, over and over and over again.

\* \* \*

So I have nothing but grave concerns about any potential for rehabilitation by you, and it seems unlikely because this is a pattern you have engaged in for 30 years of getting drunk and beating people—at least people that are small enough for you to be able to beat."

The trial court imposed consecutive sentences of six years' imprisonment for the first count of domestic battery and two years' imprisonment for the criminal contempt finding.

¶ 29 Hoffman moved for reconsideration of the aggregate sentence, asserting generally that it was excessive. He argued that the court gave undue weight to factors in aggravation and "failed to recognize and fairly apply the rule of lenity and construction of the sentence factors in [his] favor." The court denied the motion, and Hoffman timely appealed.

¶ 30 On initial direct appeal, Hoffman argued that his extended-term domestic battery sentence was the product of double enhancement. The State confessed error and asked us to reduce Hoffman's sentence to the Class 3 felony maximum of five years' imprisonment. We did so. Our mandate on summary remand required defense counsel to file a certificate under Illinois Supreme Court Rule 604(d) (eff. July 1, 2017).

¶ 31 On remand, defense counsel filed his Rule 604(d) certificate and refiled the motion to reconsider the sentence. The court denied the motion, and this second direct appeal followed.

¶ 32 II. ANALYSIS

¶ 33 Section 5-8-4(a) of the Unified Code of Corrections (Code) (730 ILCS 5/5-8-4(a) (West 2016)) establishes a presumption that sentences are to be concurrent unless the court makes an adequately grounded finding that consecutive sentences are necessary. Hoffman argues that consecutive sentencing was error because (1) the trial court mistakenly believed that it was mandatory, (2) discretionary consecutive sentencing is not supported by the evidence, (3) the court failed to articulate an adequate basis, and (4) *People v. McPherson*, 2018 IL App (2d) 170966, compels reversal. We disagree with Hoffman on all points.

¶ 34 A sentence imposed for criminal contempt, like any other sentence, is subject to review for an abuse of discretion. *People v. Geiger*, 2012 IL 113181, ¶ 27. "A sentence will be deemed an abuse of discretion where the sentence is greatly at variance with the spirit and purpose of the law, or manifestly disproportionate to the nature of the offense." (Internal quotation marks omitted.) *Geiger*, 2012 IL 113181, ¶ 27. However, because there are no statutory provisions to set the range of sentences available for criminal contempt of court, courts have a " 'special responsibility for determining that the [contempt] power is not abused.' " *Geiger*, 2012 IL 113181, ¶ 27 (quoting *Green v. United States*, 356 U.S. 165, 188 (1958)). "[W]hen imposing a sentence for contempt, a court should keep in mind that the contempt power is extraordinary and thus should be used sparingly and with the utmost sensitivity." *McPherson*, 2018 IL App (2d) 170966, ¶ 19; see also *Geiger*, 2012 IL 113181, ¶ 25.

¶ 35 In *Geiger*, our supreme court adopted the United States Supreme Court's four factors for setting a sentence for criminal contempt: "(1) the extent of the willful and deliberate defiance of the court's order, (2) the seriousness of the consequences of the contumacious behavior,

(3) the necessity of effectively terminating the defendant's defiance as required by the public interest, and (4) the importance of deterring such acts in the future." *Geiger*, 2012 IL 113181, ¶ 28 (citing *United States v. United Mine Workers of America*, 330 U.S. 258, 303 (1947)).

¶ 36 The *Geiger* standard is harmonious with section 5-8-4(c)(1) of the Code, which provides that the court may impose consecutive sentences if,

> "having regard to the nature and circumstances of the offense and the history and character of the defendant, it is the opinion of the court that consecutive sentences are required to protect the public from further criminal conduct by the defendant, the basis for which the court shall set forth in the record." 730 ILCS 5/5-8-4(c)(1) (West 2016).

"[A] trial court's imposition of consecutive sentences [is] not in and of itself sufficient to imply that the court was of the opinion that the consecutive term was necessary for the protection of the public ***." *People v. Hicks*, 101 Ill. 2d 366, 374-75 (1984). That said, a trial court "need not recite the language of the statute in reaching its determination: 'What *is* required is that the record show that the sentencing court is of the opinion that a consecutive term is necessary for the protection of the public.' " (Emphasis added.) *Hicks*, 101 Ill. 2d at 375 (quoting *People v. Pittman*, 93 Ill. 2d 169, 178 (1982)).

¶ 37                              A. Mandatory Consecutive Sentencing

¶ 38 Hoffman claims that the trial court was under the misapprehension that consecutive sentences were mandatory under section 5-8-4(d)(8) of the Code (730 ILCS 5/5-8-4(d)(8) (West 2016)). Section 5-8-4(d)(8) provides:

> "If a person charged with a felony commits a separate felony while on pretrial release or in pretrial detention in a county jail facility or county detention facility, then the sentences imposed upon conviction of these felonies shall be served consecutively regardless of the order in which the judgments of conviction are entered." 730 ILCS 5/5-8-4(d)(8) (West 2016).

Criminal contempt is not a felony, as it lacks a specific sentencing range. See *People v. Perez-Gonzalez*, 2014 IL App (2d) 120946, ¶ 33 (because criminal contempt lacks a sentencing range, it cannot be a Class X felony).

¶ 39 We first conclude that the record does not establish that the trial court believed that consecutive sentences were mandatory. We must presume that the court "knows and follows the law unless the record affirmatively indicates otherwise." *In re Jonathon C.B.*, 2011 IL 107750, ¶ 72. Here, when the court admonished Hoffman before he admitted to the contempt petition, it told him, "[Y]ou could be sentenced for a term in the penitentiary *** to be determined by this Court without regard to any particular minimum or maximum." The court did not mention that the sentencing would be mandatorily consecutive to the domestic battery sentence. In the absence of evidence to the contrary, we presume that the court was aware that consecutive sentences were discretionary.

¶ 40                              B. Discretionary Consecutive Sentencing

¶ 41 Hoffman argues second that his act of contempt is not such that he could properly be given discretionary consecutive sentences under section 5-8-4(c)(1) of the Code (730 ILCS 5/5-8-4(c)(1) (West 2016)). That section provides that the court may impose consecutive sentences if,

"having regard to the nature and circumstances of the offense and the history and character of the defendant, it is the opinion of the court that consecutive sentences are required to protect the public from further criminal conduct by the defendant, the basis for which the court shall set forth in the record." 730 ILCS 5/5-8-4(c)(1) (West 2016).

He contends that " 'protecting the public' was not really at issue *** where the contemptuous act was a seconds-long phone call to [his] own home phone."

¶ 42    We reject Hoffman's assertion that for consecutive sentences to be proper the court needed to find that his *specific* act of contempt posed an immediate danger to the general public. Section 5-8-4(c)(1) requires a showing that "consecutive sentences are required to protect the public from *further* criminal conduct," not that the conduct itself posed an immediate danger. (Emphasis added.) 730 ILCS 5/5-8-4(c)(1) (West 2016).

¶ 43    We hold that the record supports the conclusion that consecutive sentences are required to protect the public from further criminal conduct by Hoffman. 730 ILCS 5/5-8-4(c)(1) (West 2016). At the sentencing hearing, the State presented evidence that Hoffman victimized four women as part of a pattern of abuse that started as early as 1998. Moreover, Hoffman's pattern of contacting J.B. showed a complete disregard of the court's no-contact order. Even if Hoffman were not bound by the no-contact requirement in the bail bond order because he had not been released from custody, he completely disregarded the court's May 12, 2016, order that he not contact J.B. He tried to evade the order by calling his house, knowing that J.B. was the only one likely to answer. He also tried to conceal his attempts to contact J.B. by using Whitney as a messenger and by using other inmates' PINs to call her. We thus conclude that the court did not abuse its discretion in determining that incarceration was the only reliable way to stop Hoffman from engaging in his pattern of abuse.

¶ 44    Furthermore, the consecutive sentences were consistent with the factors for a contempt sentence set out in *United Mine Workers* and adopted by *Geiger*. Those four factors are "(1) the extent of the willful and deliberate defiance of the court's order, (2) the seriousness of the consequences of the contumacious behavior, (3) the necessity of effectively terminating the defendant's defiance as required by the public interest, and (4) the importance of deterring such acts in the future." *Geiger*, 2012 IL 113181, ¶ 28. All factors weigh in favor of a sentence that would not be subsumed into the felony sentence, the first, third, and fourth factors strongly so.

¶ 45    Concerning the first factor, the record supports the court's conclusion that the violation was entirely willful. Hoffman's choice to call his house to reach J.B. was consistent with his other ruses to evade detection of his contact attempts.

¶ 46    Concerning the second factor, the effects of Hoffman's contumacious behavior were harmful to J.B. and potentially very serious. We note that J.B. appeared to cooperate fully with the State at trial. Still, Hoffman tried to hinder that cooperation and might have influenced her to lie to two assistant state's attorneys about the cause of an injury that Hoffman inflicted. Moreover, his contacts could easily have led her to try to sabotage the prosecution, potentially leading to his acquittal.

¶ 47    Concerning the third factor, it was in the public interest to terminate Hoffman's defiance of the no-contact order. To be sure, the *specific* act of defiance for which the court punished Hoffman was over in a few seconds. But his violation of the court's no-contact order continued. As part of the plea agreement, the State dismissed four additional contempt counts relating to such conduct. Moreover, Hoffman tried to deceive jail authorities in his contact attempts,

suggesting that, absent significant punishment, he would seek to continue contacting J.B. from jail.

¶ 48    Concerning the fourth factor, the evidence showed that Hoffman pressed his victims to protect him from the legal consequences of his crimes. No-contact orders are a court's primary tool to prevent such pressure. As Hoffman is a repeat offender, the threat he poses to public safety warrants a sentence that deters him from trying to dissuade J.B. and those in her position from cooperating in further prosecutions. Were his contempt sentence to be subsumed into his felony sentence, Hoffman might think he has nothing to lose by pressuring witnesses. Deterrence is more likely if his sentences are consecutive.

¶ 49                                C. Articulated Basis

¶ 50    Third, Hoffman asserts that the court failed to properly set out a basis for making the sentences consecutive. The court's explanation for the sentences made clear that their purpose was to protect the public by keeping Hoffman away from J.B. and other women with whom he might become involved, for as long as reasonably possible. The court indicated that it did not believe that Hoffman had any capacity to change and that he and J.B. would likely resume an abusive relationship when Hoffman was out of prison. It found that Hoffman had demonstrated complete unwillingness to comply with an order not to contact J.B. Finally, it expressed concern for the burden on the Villa Park police.

¶ 51                                    D. *McPherson*

¶ 52    Fourth and finally, Hoffman argues that *McPherson*, 2018 IL App (2d) 170966, a case in which we found a consecutive sentence for contempt to be an abuse of discretion, requires us to make his contempt sentence concurrent with his domestic battery sentence.

¶ 53    We deem *McPherson* to be readily distinguishable. In that case, the defendant was originally charged with a felony drug offense but was granted use immunity to testify at his brother's murder trial. *McPherson*, 2018 IL App (2d) 170966, ¶ 3. When he refused to testify, the State charged him with direct criminal contempt of court. He pled guilty both to contempt and to the drug offense. *McPherson*, 2018 IL App (2d) 170966, ¶¶ 3-4. In imposing the consecutive sentence for contempt, the trial court emphasized the importance of society's right to compel testimony and the importance of deterring others from refusing to testify. *McPherson*, 2018 IL App (2d) 170966, ¶ 12. "The trial court stated that, because [the] defendant was in jail on the drug offense when he committed the contempt, it believed that the sentence must be consecutive," but the court added that it would have imposed one discretionarily " 'based upon the facts and circumstances of [the] case.' " *McPherson*, 2018 IL App (2d) 170966, ¶ 13. The court imposed consecutive prison terms of six years for the contempt and three years for the drug offense. *McPherson*, 2018 IL App (2d) 170966, ¶¶ 11, 13.

¶ 54    On appeal, we held that the consecutive sentencing was an abuse of discretion. The trial court incorrectly treated contempt as a felony, improperly concluding that a consecutive sentence was mandated based on the defendant committing the contempt while on pretrial release or in jail for a prior felony. *McPherson*, 2018 IL App (2d) 170966, ¶¶ 30-31. Moreover, the basis that the trial court gave for imposing consecutive sentences discretionarily was inadequate. The court *did not* find that a consecutive sentence was necessary to protect the public from the defendant's further criminal conduct. *McPherson*, 2018 IL App (2d) 170966,

¶ 33. Furthermore, "even had the trial court enunciated its basis on the record, a consecutive sentence was not proper under the circumstances." *McPherson*, 2018 IL App (2d) 170966, ¶ 34. The "unique circumstance" that led to the defendant's refusal to testify was not likely to recur, and the defendant's minor criminal history did not suggest a high propensity to commit further criminal acts. *McPherson*, 2018 IL App (2d) 170966, ¶ 34. We therefore made the defendant's contempt sentence concurrent with the other sentence. *McPherson*, 2018 IL App (2d) 170966, ¶ 36.

¶ 55 None of the bases for modifying the sentence in *McPherson* is present here. The record is such that we presume that the trial court knew that consecutive sentences were discretionary. The trial court clearly explained why it thought that the public needed to be protected against future offenses by Hoffman. Hoffman's history of similar offenses supported the conclusion that the consecutive sentences were necessary to protect the public.

¶ 56 III. CONCLUSION

¶ 57 For the reasons stated, we affirm Hoffman's sentence.

¶ 58 Affirmed.