2021 IL App (2d) 180276-U
No. 2-18-0276
Order filed April 12, 2021

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Winnebago County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 15-CF-1186 |
| JAMES EDWARD WILLIAMS, | ) ) ) | Honorable Ronald J. White, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE BRENNAN delivered the judgment of the court.
Presiding Justice Bridges and Justice Hudson concurred in the judgment.

**ORDER**

¶ 1    *Held*: Jury instruction that permitted jury to consider hearsay testimony for propensity was not reversible error because defendant forfeited argument and could not show purported error satisfied either prong of plain error. Defendant forfeited argument that State improperly introduced witness's prior grand jury testimony and could not show that the trial court erred. Evidence in record supported trial court's implicit finding that offenses arose out of unrelated courses of conduct, thus extended-term sentence was proper. Affirmed.

¶ 2    Defendant, James Edward Williams, was convicted of first-degree murder (720 ILCS 5/9-1(a)(1) (West 2008)) and concealment of homicidal death (720 ILCS 5/9-3.1(a) (West 2008)). Defendant appeals on three grounds: (1) the trial court improperly permitted the jury to consider

hearsay evidence for propensity, (2) the trial court improperly permitted the State to read a witness's prior grand jury testimony into evidence, and (3) the trial court improperly imposed an extended-term sentence on defendant for his conviction for concealment of homicidal death. For the following reasons, we affirm.

¶ 3                                 I. BACKGROUND

¶ 4      At the time of her death in 2008, Chaundra Davis lived with her two children, Jonathan and Jamacia Davis, in a house on Revell Street in Rockford, Illinois. She also had previously lived in an apartment in the Fairgrounds Housing Complex. In approximately 2003, Chaundra began dating defendant. Friends and family of Chaundra described that relationship as intermittent. Chaundra was last seen alive on November 7, 2008.

¶ 5      On November 8, 2008, Chaundra was reported missing by members of her family when they could not reach her by phone and, after driving to her home to look for her, they discovered that she was not there. Defendant, however, was there. This surprised Chaundra's sister and mother, who believed she had ended the relationship permanently. Police arrived and asked defendant to leave and, thereafter, searched Chaundra's home and her car twice: once on November 8, 2008, and again on November 12, 2008. Although the searches disclosed a number of Chaundra's personal effects which she characteristically brought whenever she left the house, police found no other physical evidence of a crime. On November 22, 2008, Chaundra's body was discovered floating in the Rock River. On May 27, 2015, the State charged defendant with first-degree murder and concealment of homicidal death.

¶ 6                                 A. Pre-Trial Ruling

¶ 7      Before trial, defendant filed a motion *in limine* seeking to bar the State from introducing evidence of prior bad acts to show propensity. The State subsequently filed its own motion *in*

*limine* seeking to admit testimony from more than two dozen witnesses pertaining to defendant's "history of violence toward women," including Chaundra. Some witnesses were Chaundra's family members, friends, and acquaintances; some were police officers; and some were other women who had dated or otherwise interacted with defendant. The State sought to introduce direct evidence of defendant's prior bad acts under 725 ILCS 5/115-7.4 (West 2016) as well as hearsay statements made by Chaundra to others under 725 ILCS 5/115-10.2a (West 2016).

¶ 8    The trial court, in ruling on the State's motion *in limine*, categorized the evidence as follows:

> "They are *** essentially two categories of evidence that the State is seeking to admit at trial; and that is *** prior bad acts and acts of domestic violence under the *Illgen* case; but specifically under 115-7.4 of the Code of Criminal Procedure *** [and] statements made by victim Chaundra Davis to others. And the subcategory of that I suppose would be statements made to others and statements made to others who are or who were police officers at the time."

As to the first category, the court ruled that direct evidence of prior bad acts, other than those it deemed were "too remote" from the alleged murder, would be admissible under section 115-7.4. As to the second category, the court made two rulings: first, hearsay statements made by Chaundra to police officers would be inadmissible; and second, hearsay statements made by Chaundra to family members, friends, and acquaintances, with a few exceptions, would be admissible under section 115-10.2a. As to the hearsay ruled admissible, the court stated that it found the following: (1) the charged offense was a domestic violence classification, (2) Chaundra was a person protected by the Illinois Domestic Violence Act, (3) Chaundra was unavailable to testify, (4) the statements were "offered as evidence of a material fact, and that is the nature of their relationship,

motive and intent of the defendant," (5) the statements were "more probative on these issues than any other evidence which could reasonabl[y] be procured by the State," and (6) the statements had circumstantial guarantees of trustworthiness.

¶ 9                                    B. Trial Testimony

¶ 10    At trial, the State introduced testimony describing various accounts of defendant's past conduct. Witnesses described the following incidents: (1) an incident on January 24 and 25, 2004, in which defendant allegedly entered Chaundra's apartment twice while she was out and caused extensive damage to furniture and other property; (2) an incident later in 2004 in which Chaundra sustained a swollen eye following an altercation with defendant; (3) a June 25, 2005, incident in which defendant pushed Chaundra and choked her during an argument; (4) a June 28, 2005, incident in which defendant pulled a telephone from the wall of Chaundra's home as she attempted to call police; (5) an October 8, 2006, incident in which defendant was arrested for damaging Chaundra's bathroom door; (6) a March 23, 2008, incident in which defendant appeared unexpectedly in Chaundra's home and threatened her; (7) an incident in the summer of 2008 in which defendant pushed Chaundra against a wall, prompting her son, Jonathan, to hit defendant in retaliation; and (8) multiple incidents in late 2008, one in which defendant bit Chaundra's finger, one in which he tried to choke her, and one in which he forced her to ingest pills. Other women testified about violent conduct occurring prior to defendant's relationship with Chaundra and following her death. Further, multiple witnesses testified about incriminating statements made by defendant before and after Chaundra's death.

¶ 11    Testimony relevant to the appeal is described below.

¶ 12                              1. The State's Case-in-Chief

¶ 13 Xica Davis was Chaundra's sister. She testified that she last saw Chaundra the night before her disappearance, that she had observed Chaundra's "destroyed" apartment following the January 2004 incident, and that she had seen Chaundra with an injured finger in October 2008. Xica also testified that Chaundra told her in 2007 that she planned to end her relationship with defendant and that he had bitten her finger "so hard *** that it was broken."

¶ 14 Georgia Davis was Chaundra's mother. She testified that she observed Chaundra's damaged apartment following the January 2004 incident and that Chaundra had told her that defendant was the one who "came in and tore her house up."

¶ 15 James Davis was Chaundra's father. He testified that televisions he had purchased for Chaundra's children were destroyed during the January 2004 incident.

¶ 16 Jonathan Davis was Chaundra's son. At the time of trial he was 22. He testified that he observed the damage following the January 2004 incident. He also testified about another 2004 incident in which he had heard Chaundra screaming and crying, heard her ask defendant why he had hit her eye, and saw her swollen eye the following day; a 2005 incident in which defendant "snatched" a phone off the wall of Chaundra's home because he was angry that she was trying to make a call; a March 2008 incident in which a window was broken and he heard defendant threaten to kill Chaundra; and a summer 2008 altercation in which he saw defendant grab Chaundra by the arms and push her against the wall, prompting him to hit defendant in retaliation, after which defendant challenged him to a fight.

¶ 17 Alicia Smith was Chaundra's cousin. She testified that, during a visit to Chaundra's Fairgrounds residence in the summer of 2005, she heard Chaundra and defendant arguing, saw defendant pinning Chaundra to a wall with his arm against her neck, and saw Chaundra stab defendant with a fork after defendant tried to rush toward Chaundra.

¶ 18    Mark Dunivant is the biological father of Chaundra's daughter. He testified that, while at Chaundra's Revell residence shortly before her disappearance, he saw scratches on Chaundra's neck and Chaundra told him that defendant had grabbed and scratched her neck during an altercation.

¶ 19    Reginald Potter is the father of one of Chaundra's cousin's children. He testified that, a few nights before her disappearance, Chaundra called and told him, "She needed me to stay the night with her because she was having problems—her and [defendant] were having problems. She was scared," and that, the following day, she said defendant would "strip her down naked, drag her down the steps down to the living room by her hair, pin her on the floor—he's sitting on the couch—pin her on the floor in between her legs, forcing pills down her throat."

¶ 20    Marquetta Alexander was Chaundra's neighbor at the Revell residence, and she had known Chaundra for 20 years. She testified that, in November 2008, Chaundra told her that defendant had "almost bit her finger off" during a fight. Further, Chaundra told her that, a few days later and in front of police, defendant "tried to choke her out" and threatened to kill her.

¶ 21    Rashun Wilson was Chaundra's friend. She testified that she was at Chaundra's Revell residence on March 23, 2008, when defendant appeared unexpectedly and threatened Chaundra, saying, " 'You can't keep me out. I'll burn this M-effing down, kids and all.' " She also testified that Chaundra told her shortly before her disappearance that defendant had broken her finger during an argument.

¶ 22    Tammy Gnutek was Chaundra's neighbor, and they met in 2008. She testified that, around September 30, 2008, Chaundra told her that defendant choked her during a fight a few days prior and that "she had had enough and that it was done. She was over—it was over with." She also acknowledged that she had subsequently helped Chaundra and defendant purchase crack cocaine

and that, on the morning of November 8, 2008, defendant called her between 4:00 a.m. and 6:00 a.m. asking for a ride, although she quickly hung up.

¶ 23    Cowanda Curtis was Chaundra's neighbor at the Fairgrounds residence. She testified that, on June 25, 2005, she witnessed defendant push Chaundra down and choke her with his hands following an argument.

¶ 24    April Lauderdale was Chaundra's neighbor at the Fairgrounds residence. She testified that she witnessed the same altercation between Chaundra and defendant described by Cowanda Curtis, stating that defendant "pretty much choked her and pushed her over." She also testified that defendant showed up uninvited to a party in 2009, that he was "kind of distraught" and "probably a little tipsy," and that, after Chaundra came up in conversation, "He was telling me he wished he could take it all back, that he missed her and he wished he could take it all back."

¶ 25    Lily Sturdivant was a friend of Chaundra's. She testified that one day, while visiting the Fairgrounds residence two to three years after Chaundra began dating defendant, she was watching the television show "CSI" with Chaundra and defendant and, "While we was watching the show he said he know how to get rid of a body, he could put it in the water."

¶ 26    Christy Burrows dated defendant in 2009. She testified that on October 17, 2009, defendant came over to her house. At some point "he was saying things like if I would have left him he would try to kill me." He told her " 'I'll make you come up missing like the other person did,' " although she did not know who he was referring to. Further, he tried to choke her with his bicep while they had "rough sex," which she said she engaged in because "[she] didn't want to take any chances of anything crazy, you know, that night." Initially, Burrows indicated that defendant had not threatened her on any other occasions. The State, however, questioned her about her prior grand jury testimony as follows:

"[ASSISTANT STATE'S ATTORNEY] Q. Okay. Again, do you remember testifying in the grand jury?

[CHRISTY BURROWS] A. Yeah.

Q. Okay. And you testified on May 13th of 2015; correct?

A. Uh-huh.

Q. Okay. And do you remember being asked this question: Aside from that one time that he was choking you and threatening you, did he ever threaten you any other time? And do you remember giving this answer: He said it down the line again, the same thing, that 'I'm going to try and kill you like I killed the other person, and this time your body is not going to come up. It's going to come up missing. There ain't going to be no—no body around.'

A. Yeah.

Q. Do you remember giving that answer?

A. Yeah.

Q. Okay. And is that true?

A. He did say that."

Burrows further testified that, after having sex with defendant, "I called the cops on myself. After he said that about I'd come up missing like the other one, I called the cops when he was getting me a cup of water. *** I had outstanding warrants out. So I'd know if I went to jail, I would feel safer if I went and turned myself in for that night."

¶ 27    Carolyn Herd dated defendant in 2002. She testified that, on June 6, 2002, approximately one month after she had broken up with him, defendant was at her house when he choked her from behind with boot strings, tied her to a chair, and threatened to kill her.

¶ 28    Officer Phil Statler testified that on June 6, 2002, he responded to a noise complaint at Carolyn Herd's residence and observed Herd and defendant through a window in the front door. Defendant walked behind Herd as if "trying to grab her, chase her" and Herd "was visibly shaking, upset, appeared to be scared" and had a cut on her elbow, a bite mark on her arm, and rope around her wrist.

¶ 29    Officer Jason Plumb testified that, on October 8, 2006, he responded to a domestic trouble incident at Chaundra's Fairgrounds residence, observed damage to a bathroom door, and subsequently arrested defendant for criminal damage to property. The State also introduced a certified copy of defendant's conviction for the offense.

¶ 30    Officer Jonathan Deutsch testified that on June 28, 2005, he responded to a 911 hang-up call at Chaundra's Fairgrounds residence, spoke to Chaundra and her son, and observed that a phone line appeared to have been "torn from the wall." The State also introduced a certified copy of defendant's conviction for interfering with a report of domestic violence in connection with the incident.

¶ 31                              2. Defendant's Testimony

¶ 32    Defendant took the stand and testified about what happened on November 7 and 8, 2008. He said that he had been living with Chaundra in her home and that, on November 7, he and Chaundra went out to purchase crack cocaine and beer. They returned home to consume the crack cocaine and beer. Later, Chaundra went out again to purchase more crack cocaine while defendant stayed home and fell asleep. She went out alone and left her car behind. Defendant said that on the morning of November 8, Chaundra had not returned home and he drove her car around town looking for her. Unable to find her, he returned to the house and spent most of the remainder of the day there.

¶ 33    On cross-examination, defendant admitted to causing the damage in Chaundra's apartment during the January 24 and 25, 2004, incident, to damaging the door and phone during the June 28, 2005, incident, and to damaging the basement window during the March 23, 2008, incident. Although he admitted to getting into physical altercations with Chaundra, he denied ever choking her.

¶ 34                                    3. Other Evidence

¶ 35    Police searched Chaundra's home and car on November 8 and 12, 2008. Rockford police officers testified that on November 8, after being called to Chaundra's home for a report of a possible missing person, they observed that Chaundra's purse, ID, car keys, and cash and credit cards were present, but they did not collect any evidence at that time. Further, there was no indication that anything inside the home or in Chaundra's car had been disturbed. Another officer testified that, on November 12, the Rockford Identification Unit conducted a search of Chaundra's home and car using an alternative light source, but did not find any blood, stains from other biological substances, or signs of a struggle.

¶ 36    Detective Mary Ogden testified that, on November 20, 2008, she interviewed defendant about Chaundra's disappearance and, following the interview, overheard a conversation between defendant and his mother. Prior to that conversation, police had not told defendant that Chaundra was dead because her body had not yet been discovered. Ogden heard defendant say, "because she is dead and my stories aren't the same" to his mother during the conversation. On cross-examination, however, she acknowledged that, prior to the overheard conversation, she had "asked [defendant] where he thought Chaundra was and if he thought Chaundra was dead." Defendant admitted that he made the statement to his mother, but testified that the detective had told him Chaundra was dead.

¶ 37    Chaundra's body was discovered on November 22, 2008, floating in the Rock River. Two forensic pathologists testified that Chaundra's body had numerous lacerations and bruises that were sustained prior to death. They believed the cause of death was manual strangulation. Further, one of the forensic pathologists testified that, based on the autopsy report, Chaundra had not inhaled water into her lungs and there did not appear to be evidence of drowning.

¶ 38                                    C. Jury Instructions

¶ 39    Following the close of evidence, the trial court, counsel for the State, and defense counsel engaged in a jury instructions conference. In that conference, the State initially indicated that it did not believe an instruction should be given regarding the issue of propensity as it related to the use of other crimes evidence. The trial court, in contrast, stated, "to not give *** any instruction to this jury I do believe would be error on my part." After further discussion, the court turned to defense counsel, who stated, "We are objecting to a 3.14 instruction" to which the court responded, "I do believe that [an instruction is necessary]. I do believe I would be committing error. They need to be instructed. You just can't go back and say use it for whatever purpose you want. There are other crimes involved here. I think that's improper." After further discussion, the court directed the State to submit a proposed instruction delineating the proper use of propensity evidence by the jury. The final jury instruction, modeled after Illinois Pattern Jury Instruction No. 3.14 (Illinois Pattern Jury Instructions, Criminal, No. 3.14 (approved Oct. 17, 2014) (hereinafter IPI Criminal No. 3.14)) read as follows:

   "Evidence has been received that the defendant has been involved in offenses and
   conduct, other than those charged in the indictment.

   This evidence has been received on the issue of the Defendant's propensity and
   may be considered by you for that limited purpose. It is for you to determine whether the

defendant was involved in those offenses and conduct and, if so, what weight should be given to this evidence on the issue of propensity.

This evidence has also been received on the issues of intent, motive, design and knowledge and may be considered by you only for that limited purpose.

It is for you to determine whether the defendant was involved in those offenses and conduct and, if so, what weight should be given to this evidence on the issues of intent, motive, design and knowledge."

Other than objecting to an IPI Criminal 3.14 instruction in the first place, defense counsel did not object to the modified IPI Criminal 3.14 instruction offered by the State or offer an alternative instruction.

¶ 40                            D. Verdict and Defendant's Posttrial Motion

¶ 41    The jury found defendant guilty of first-degree murder and concealment of homicidal death. Defendant thereafter filed a motion for a new trial. In his posttrial motion, defendant asserted that the trial court "erred in giving instruction 3.14 modified over defense objection."

¶ 42    The court sentenced defendant to 70 year's imprisonment, including a 60-year term for first-degree murder consecutive to a 10-year extended-term for concealment of homicidal death. Defendant did not challenge the extended-term sentence for concealment of homicidal death at his sentencing hearing or in a postsentencing motion. Defendant timely appealed.

¶ 43                                        II. ANALYSIS

¶ 44    Defendant raises the following arguments on appeal: (1) the jury was improperly instructed such that hearsay evidence, previously admitted to show "relationship, motive[,] and intent," could be considered for propensity; (2) the State's reading into evidence of Christy Burrows' grand jury testimony was plain error; and (3) the trial court erred when it gave defendant an extended-term

sentence for concealment of homicidal death. As a preliminary matter, the State contends that defendant forfeited all three issues by either failing to contemporaneously object at trial or by failing to raise the issues in a posttrial motion. See *People v. Staake*, 2017 IL 121755, ¶ 30. A reviewing court may nonetheless consider a forfeited claim for plain error. *Id.* ¶ 31. To prevail, a defendant must show that a clear or obvious error occurred and either: (1) the evidence was closely balanced, regardless of the seriousness of the error; or (2) the error was so serious that it undermined the fairness of the trial, regardless of the closeness of the evidence. *Id.* We review each claim in turn.

¶ 45                           A. Improper Jury Instruction

¶ 46    Defendant identifies numerous hearsay statements that he claims the trial court should have only permitted the jury to consider for "relationship, motive[,] and intent": (1) Chaundra's statement to Xica Davis in October 2008 that defendant "had bitten her finger so hard 'that it was broken' "; (2) Chaundra's statement to Georgia Davis that defendant "came in and tore her house up" in regards to the January 2004 incident; (3) Chaundra's statements to Tammy Gnutek in September 2008 describing a recent incident in which defendant had choked her; (4) Chaundra's statements to Marquetta Alexander in November 2008 that defendant had recently "almost bit her finger off" and "tried to choke her out"; (5) Chaundra's statement to Rashun Wilson that defendant had broken her finger during a fight; (6) Chaundra's statement to Mark Dunivant in November 2008 that defendant had grabbed and scratched her neck during a recent fight; (7) Chaundra's statement to Reginald Potter in November 2008 that defendant had recently stripped her naked, dragged her by the hair through their home, pinned her down, and forced pills down her throat; and (8) statements to multiple witnesses expressing Chaundra's intent and desire to end her

relationship with defendant. On appeal, defendant challenges the hearsay evidence to the extent it was improperly considered for propensity.

¶ 47                                1. Forfeiture

¶ 48     The State first asserts that defendant forfeited his claim that the trial court gave an erroneous instruction. "Generally, a defendant forfeits review of any putative jury instruction error if the defendant does not object to the instruction or offer an alternative instruction at trial and does not raise the instruction issue in a posttrial motion." *People v. Herron,* 215 Ill.2d 167, 175 (2005). A claim that the trial court gave an erroneous jury instruction is not forfeited on appeal merely because a defendant does not tender an alternative instruction. See *People v. Goff*, 137 Ill. App. 3d 108, 113 (1985). But a defendant must specifically inform the trial court of its mistake. See *People v. Smalley*, 10 Ill. App. 3d 416, 426 (1973).

¶ 49     Here, we note that defendant did in fact initially object to the inclusion of *any* instruction based on IPI Criminal No. 3.14 at trial at the initial jury instruction conference. Likewise, in his posttrial motion, defendant asserted generally that the trial court "erred in giving instruction 3.14 modified over defense objection." But he failed at any point to object specifically to the language in the State's modified 3.14. This distinction is important. The trial court correctly ruled initially that it was obligated to give the jury *a* 3.14 instruction in reference to the offense-conduct evidence it had admitted. See Ill. S.Ct. R. 451(a) (eff. April 8, 2013) (Jury Instruction "shall be used, unless the court determines that it does not accurately state the law"). At a follow-up instruction conference, the State proffered for the first time the now-complained-of modified 3.14 instruction. At this point it was incumbent on defendant to object to the content of the modified 3.14 instruction to preserve any error regarding the content. This defendant did not do. Instead, defendant persisted in his earlier general objection to the giving of *any* 3.14 instruction. Defendant's failure to

complain to the trial court that the State's modifications to 3.14 allowed the jury to improperly consider hearsay evidence for propensity deprived the court of the opportunity to correct this purported mistake. See *Smalley*, 10 Ill. App. 3d at 426; see also, *People v. Mohr*, 228 Ill. 2d 53, 64-65 (2008) (objection raised below to jury instruction must be "close enough" to issue raised on appeal to avoid forfeiture). To the extent defendant now complains of the modifying language in the 3.14 instruction for the first time on appeal, defendant has forfeited the claim.

¶ 50                                    2. Plain Error

¶ 51    Defendant nevertheless argues that both prongs of plain error provide bases to reverse. Although courts typically begin plain-error analysis by asking whether an error occurred at all, that step is not necessary when it is clear that a defendant cannot satisfy either prong. See *People v. Scott*, 2015 IL App (4th) 130222, ¶¶ 32, 33. Assuming *arguendo* that an error occurred, it is clear that defendant cannot establish that the evidence was closely balanced under the first prong or that a serious error occurred under the second prong.

¶ 52                              i. First Prong of Plain Error

¶ 53    To succeed under the first prong of plain error, a defendant must show that the evidence was so closely balanced that the jury instruction alone threatened to tip the scales of justice. *People v. Sebby*, 2017 IL 119445, ¶ 51. The hearsay statements at issue were properly admitted as evidence of relationship, motive, and intent. The jury could thus consider them as evidence of defendant's animosity towards Chaundra. Their probative value for this purpose likely eclipsed their probative value with respect to defendant's general criminal propensity. The effect of a general criminal propensity inference on the outcome of the trial, therefore, was likely minimal.

¶ 54    Moreover, despite defendant's contention that there was a lack of direct evidence, the amount of evidence presented by the State was substantial. First, multiple women testified about

defendant's past abusive conduct towards them, and this evidence was admissible for propensity. Second, the State introduced several inculpatory statements made by defendant which tended to show his guilt. Third, the State presented evidence of defendant's prior convictions for criminal damage to property and interfering with a report of domestic violence. Fourth, and most significant, the State presented testimony from several witnesses who personally witnessed defendant's violence towards Chaundra. The most notable witness was her son, Jonathan, who testified about three separate physical altercations.

¶ 55    Finally, much of the hearsay testimony about which defendant complains was cumulative given the variety of direct observations by other witnesses. For instance, several witnesses testified that Chaundra told them defendant had, at different times, choked her, bit her finger, and pinned her to the ground while forcing her to ingest pills. While none of the witnesses testified to directly witnessing those acts, other witnesses did personally observe acts of abuse. Alicia Smith saw defendant pin Chaundra against a wall with his arm against her neck. Cowanda Curtis and April Lauderdale saw defendant push Chaundra down and choke her following an argument. And Jonathan Davis described several altercations, including one in which he, a teenager at the time, struck defendant in retaliation. Further, on cross-examination, the State elicited admissions from defendant that he was the one who caused the damage to Chaundra's apartment in January 2004, that he pulled the phone from Chaundra's wall in 2005, and that he damaged her bathroom door in 2006. We conclude that the non-hearsay evidence overwhelmingly supports conviction and that any consideration of properly admitted hearsay evidence for propensity was merely cumulative and negligible. The purported error did not deny defendant a fair trial. Accordingly, defendant cannot show that the evidence was closely balanced.

¶ 56                            ii. Second Prong of Plain Error

¶ 57    To succeed under the second prong of plain error, a defendant must demonstrate that an erroneous jury instruction created a serious risk of conviction because jurors did not understand the applicable law, thus creating a severe threat to the fairness of the trial. *People v. Getter*, 2015 IL App (1st) 121307, ¶ 62. An erroneous jury instruction should be placed in the context of the entire case to determine if it created such a risk. See *People v. Young*, 2013 IL App (2d) 120167, ¶ 33. *People v. Clark*, 2015 IL App (1st) 131678, is instructive for the issue here.

¶ 58    In *Clark*, the defendant was charged with stealing a bicycle in 2012. The State filed a motion *in limine* seeking to introduce evidence that the defendant had stolen a bicycle in 2008 to show intent and identity. The trial court granted the State's motion. Following the close of evidence, the court instructed the jury on the use of that evidence pursuant to IPI Criminal 3.14, but omitted a paragraph which would have instructed the jury that it was for them to determine whether the defendant had committed the 2008 theft and, if so, what weight it should assign to that evidence. Despite forfeiting the issue, the defendant argued that the omission constituted second-prong plain error. The appellate court rejected the argument, concluding that although the trial court erred, it did not create a serious risk that the jury misapplied the law, noting, "The trial court's instruction told the jury that it 'may' consider the other-crime evidence for purposes of intent and identity." *Id.* ¶ 81. Thus, "[T]he instruction in this case did not contain an affirmative misstatement of the law; it was simply incomplete." *Id.* ¶ 80. Further, the jury was instructed generally that it was required to determine the facts from the evidence and assign whatever weight to the witness testimony it deemed appropriate. *Id.* ¶ 81.

¶ 59    Like in *Clark*, the instruction at issue here did not contain an affirmative misstatement of the law. Instead, it was arguably incomplete. The modified version of IPI Criminal 3.14 given correctly informed the jury how it should use and consider, for those limited purposes, (1) evidence

admitted for propensity and (2) evidence admitted for "intent, motive, design and knowledge," respectively. But it did not specify which evidence belonged to either category. To the extent the trial court should have specifically told the jury to consider certain hearsay statements only for "intent, motive, design and knowledge" and not for propensity, the failure to do so was not an affirmative misstatement of the law. Further, given the overwhelming quantum of evidence and the cumulative nature of the contested hearsay evidence, we cannot say that the disputed instruction created a serious risk that defendant was convicted because the jury misunderstood the law. Thus, defendant cannot show that a serious error occurred.

¶ 60    Having concluded that defendant forfeited his argument and that he cannot establish plain error, defendant's claim fails.

¶ 61                    B. Improper Reading of Grand Jury Testimony

¶ 62    Defendant next contends that the trial court improperly permitted the State to impeach Christy Burrows by confronting her with a consistent prior statement made by her during grand jury proceedings. The State counters that the prior statement was inconsistent and admissible under 725 ILCS 5/115-10.1 (West 2016). Under section 115-10.1, a hearsay statement may be admissible at a criminal trial as a prior inconsistent statement if (1) the declarant is a witness, (2) the statement is inconsistent with her trial testimony, (3) the witness is subject to cross-examination concerning the statement, and (4) the prior statement was made under oath at a prior proceeding. *Id.* §§ 115-10.1(a), (b), (c)(1).

¶ 63    Initially we note, as the State asserts, that defendant forfeited the issue. Our review of the record discloses that defendant failed to contemporaneously object at trial to the State's questioning of Burrows regarding her prior grand jury testimony and to raise the issue in his

posttrial motion. Thus, defendant has forfeited the issue. See *People v. Staake*, 2017 IL 121755, ¶ 30.

¶ 64     Forfeiture aside, we note that to the extent both parties discuss the State's cross-examination in the context of admitting prior inconsistent statements pursuant to section 115-10.1, they miss the mark.  The grand jury testimony was not admitted as substantive evidence pursuant to section 115-10.1.  Rather, Burrows was impeached by omission when the State confronted her with the grand jury testimony.  After she then corrected her omission, there was no inconsistency, and her testimony before the jury constituted the sole substantive evidence on the issue.

¶ 65     To the extent defendant contends that her omission was not inconsistent, we find instructive *People v. Flores*, 128 Ill. 2d 66, 87–88 (1989). In *Flores*, a witness for the State in a murder prosecution testified at trial that he could not recall having a conversation with the defendant regarding the victim's death. He said he recalled giving grand jury testimony but could not recall the contents of that testimony. Over the defendant's objection, the State thereafter questioned the witness about his prior grand jury testimony in which he described a conversation in which the defendant explained why he killed the victim. The supreme court concluded that the trial court did not abuse its discretion when it allowed the introduction of the witness's grand jury statements as prior inconsistent statements. *Id.* at 88.  Whereas in *Flores* the witness testified that he could not remember a conversation about which he had previously testified before a grand jury, here the witness directly contradicted her earlier statement: at trial she stated that defendant had only threatened her one time, but she previously described a second incident in which defendant had threatened her. Accordingly, we reject defendant's argument that Burrow's testimony was not inconsistent.

¶ 66     Forfeiture aside, we thus conclude that the trial court did not err in allowing the

impeachment of Burrows with her grand jury testimony.

¶ 67                                    C. Improper Sentence

¶ 68     Finally, defendant claims the trial court improperly imposed an extended-term sentence for his concealment of homicidal death conviction. The State again maintains that defendant forfeited this issue by failing to object during his sentencing hearing or by raising the issue in a postsentencing motion. We agree. Forfeiture is binding only on the parties, however, and we may relax the rule in the interests of justice. *People v. Hughes*, 343 Ill. App. 3d 506, 510 (2003); see also *People v. Powell*, 349 Ill. App. 3d 906, 909 (2004) ("[W]e are not bound by the parties' procedural defaults and need not place them above the goals of obtaining just results[.]").

¶ 69     Pursuant to section 5-8-2(a) of the Unified Code of Corrections, where a defendant is convicted of multiple offenses that fall within different classes of severity, a trial court generally may not impose an extended-term sentence on an offense within a class of lesser severity. 730 ILCS 5/5-8-2(a) (West 2018); *People v. Bell*, 196 Ill. 2d 343, 349-50 (2001). A trial court may, however, impose an extended-term sentence on a separately charged, less severe offense when the offense arises from an "unrelated course of conduct" as the more severe offense. *Bell*, 196 Ill. 2d at 350. The test for whether an offense arises from an "unrelated course of conduct" is "whether there was a substantial change in the nature of the defendant's criminal objective." *Id.* at 354 (holding that test to be applied is same as is applied to imposition of consecutive sentences under prior version of section 5-8-4(a)).

¶ 70     The trial court need not expressly state its basis for imposing an extended term sentence as long as the record contains facts which support its findings. See *People v. Lopez*, 228 Ill. App. 3d 1061, 1075 (1992) (noting that "a court's statement of the basis for the required finding is considered directory rather than mandatory"). In *Lopez*, the defendant admitted to inadvertently

shooting his ex-wife during a heated argument, firing additional shots into her head because he believed she wanted him to kill her to end her suffering, and dumping her body in a river. He was convicted of voluntary manslaughter and concealment of homicidal death. The trial court imposed consecutive sentences, finding that the two offenses were not part of the same course of conduct and that there had been a substantial change in the nature of the defendant's criminal conduct. Accordingly, the appellate court affirmed, concluding that the trial court's finding was supported by the record. *Id.* at 1075-76; but *cf. People v. Robinson*, 273 Ill. App. 3d 1069, 1069, 1074 (1996) (finding no change in course of conduct where record showed that the defendants beat the victim until he was unconscious, concealed him in body bags, and, during subsequent process of transporting him to a dumpster, again beat him with dumbbells and shot him after hearing noises coming from the victim).

¶ 71   Considering all the evidence in the record as a whole, we conclude that the record is sufficient to support the implicit finding by the trial court that Chaundra's murder and the concealment of her body were motivated by substantially different criminal objectives and, thus, arose out of unrelated courses of conduct. First, Rockford police officers testified that Chaundra's purse, ID, car keys, and cash and credit cards, items normally expected to be brought by a person who leaves her home voluntarily, were present in Chaundra's home on the day her family reported her missing. Second, forensic pathologists testified that Chaundra had sustained multiple lacerations, contusions, and abrasions prior to her death; that many of her wounds were defensive wounds; and that the cause of death was manual strangulation. Third, one of the forensic pathologists testified that the autopsy report suggested there was no evidence of drowning or that Chaundra inhaled water. Fourth, Chaundra's body was found in the Rock River. Finally, defendant does not challenge the sufficiency of the evidence on either count. Given that the offense of

concealment of homicidal death requires the State to prove affirmative concealment, see *People v. Becerril*, 307 Ill. App. 3d 518, 528 (1999), and the jury found defendant guilty, the jury implicitly found that defendant affirmatively concealed Chaundra's death, a conclusion defendant does not challenge. Viewing the totality of the evidence, the trial court could have concluded that defendant killed Chaundra and subsequently secreted her body into the river, thus the offenses arose out of unrelated courses of conduct, and that an extended-term sentence was authorized. Although the court did not make an express finding that defendant's convictions arose out of unrelated courses of conduct, we presume the trial court knew the law and applied it properly. *People v. Hoffman*, 2020 IL App (2d) 180853, ¶ 39. We therefore cannot conclude that the trial court erred by imposing an extended-term sentence.

¶ 72                                   III. CONCLUSION

¶ 73    For the reasons stated, we affirm the judgment of the circuit court of Winnebago County.

¶ 74    Affirmed.