**NOTICE:** This order was filed under Illinois Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2025 IL App (3d) 240636-U

Order filed September 11, 2025

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2025

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 12th Judicial Circuit, Will County, Illinois, |
| Plaintiff-Appellant, | ) ) | |
| v. | ) ) | Appeal No. 3-24-0636 Circuit No. 11-CF-348 |
| | ) | |
| RAUNCHINO JAMES, | ) ) | Honorable Amy M. Bertani-Tomczak, |
| Defendant-Appellee. | ) | Judge, Presiding. |

_____

JUSTICE PETERSON delivered the judgment of the court.
Presiding Justice Brennan and Justice Holdridge concurred in the judgment.

_____

**ORDER**

¶ 1      *Held*:   The circuit court's granting of defendant's postconviction petition and ordering a new trial was not manifestly erroneous.

¶ 2      Following a third-stage evidentiary hearing under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2022)), the Will County circuit court granted the request of defendant, Raunchino James, for a new trial based on ineffective assistance of trial counsel. The State appeals, arguing the court's ruling was manifestly erroneous. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4          At the outset, we note this is the third appeal in this matter. See *People v. James*, 2016 IL App (3d) 130640-U (direct appeal); *People v. James*, 2019 IL App (3d) 160598-U (first-stage postconviction dismissal). We reiterate the facts as necessary to reach the merits.

¶ 5          In 2013, defendant and his two codefendants were convicted of home invasion (720 ILCS 5/12-11 (West 2010)), armed robbery (*id.* § 18-2), and residential burglary (*id.* § 19-3) following a bench trial. Defendant's convictions were affirmed on direct appeal. *James*, 2016 IL App (3d) 130640-U, ¶ 2. The evidence at trial established that at approximately 1:15 a.m. on February 19, 2011, Dorothy Fullilove heard banging on her door, and three men entered her home wearing dark clothing and masks and carrying handguns. The men all had dreadlocks, two had dark skin, one had lighter skin, and one man had hazel eyes and was cross-eyed. The men stole 10 $20 bills, an Xbox, a backpack, a camera, a camcorder, a computer, and a $2,500 money order. They then ran into the woods nearby. Dorothy's son, Michael Fullilove, was also present in the home and thought that one man sounded like B.G., who lived down the street.

¶ 6          An officer responded to the other side of the woods to look for the subjects. At approximately 2 a.m., he saw three men wearing dark clothing exit the woods and directed them to stop. The men walked quickly away, although, at a prior hearing, the officer said they were running. The officer followed them and observed them enter an apartment complex. The officer saw shadows moving up the apartment's exterior stairs and waited for other officers to arrive. Approximately 10 to 15 minutes later, the officers began knocking on apartment doors and asking residents if anyone had entered their residences recently. One officer testified that a man on the second floor had let him into his apartment and said the officers could look around. The name of the resident was never revealed at trial, but he was described as an uncle or cousin of defendant or

the codefendants (the codefendants were brothers). Three men wearing dark-colored clothing, including defendant, were sitting on the couch. According to the officers, they all looked disheveled and had dirt, branches, and leaves on their clothes and in their hair. They were perspiring and appeared out of breath. The three men were arrested.

¶ 7          During booking, $222 (10 $20 bills, 4 $5 bills, and 2 $1 bills) was recovered from the men. An officer testified that $82 was found on defendant and $60 was found on each codefendant. However, the officer could not explain where the additional $20 (4 $5 bills) came from, which was on the inventory list. In the woods, officers found a backpack, an Xbox, three loaded handguns, and a camcorder. A mask was found outside the apartment complex. DNA evidence from the mask had a mixture of at least three people. A major DNA profile matched one codefendant. The forensic scientist could not exclude anyone from the minor DNA profiles.

¶ 8          Dorothy and Michael were each shown a six-person photographic lineup, which did not include B.G. Dorothy was unable to make an identification, but said that one man looked familiar and another had hazel eyes similar to one of the intruders. An officer told Dorothy that the man that she said looked familiar was not one of the "perps." Prior to Michael's identification, officers told him that three men had been arrested, two were brothers, and the men had just been photographed. The photographic lineup included one man with hazel eyes and five men with dark-colored eyes. Michael chose the man with the hazel eyes and two of the other five photographs because the photographs looked newer and the individuals looked similar, as brothers would. Defendant and his two codefendants were portrayed in the photographs that Michael chose. However, before trial, the court suppressed the identification, finding the lineup was too suggestive.

¶ 9    In 2016, defendant filed a *pro se* postconviction petition. Defendant alleged, *inter alia*, that the apartment he was found at on the night in question belonged to his uncle, Roger Allen. Defendant stated that he arrived at the apartment before 12:30 a.m. that night. Defendant stated he had told his attorney that Allen would be a favorable alibi witness, but that he would have to be subpoenaed because of his work schedule. Defendant alleged that Allen's testimony was favorable and material to the outcome of the case and counsel was ineffective for failing to call Allen as a witness. Attached to the petition was an affidavit from Allen, which stated that defendant and two of his friends had arrived at his apartment at approximately 12:10 a.m. for a visit. Allen said that this was not uncommon as they have a big family. Later, officers came to his door and asked if anyone had arrived recently, to which Allen responded, "no" and asked what was going on. The officers asked defendant and his codefendants if they had been at the apartment for a while, and they said they had. The officers began searching the apartment without permission. The affidavit further averred that Allen was never contacted by the State or defense counsel, defendant and his codefendants did not arrive at the apartment out of breath, they did not have any leaves or dirt on their persons, an officer would not have been able to see someone walking up the stairs at the apartment complex, he was never subpoenaed, and he was willing and available to testify.

¶ 10    The court ultimately dismissed the petition, finding the issues defendant raised were waived as they could have been raised on direct appeal. Defendant appealed, arguing his petition set out the gist of a constitutional claim of ineffective assistance for trial counsel's failure to investigate and call Allen as a witness. *James*, 2019 IL App (3d) 160598-U, ¶ 12. This court concluded defendant's petition should have advanced to the second stage where it was arguable that failing to call Allen as a witness amounted to deficient performance and prejudiced defendant.

*Id.* ¶¶ 12-14. Further, defendant's claim was not waived because it pertained to a matter outside of the record. *Id.* ¶ 15. Thus, this court reversed the first-stage dismissal. *Id.* ¶ 17.

¶ 11 On remand, the court appointed defendant counsel, who filed an amended postconviction petition and asserted the same claim of ineffective assistance of trial counsel. On October 12, 2023, the court advanced the cause to a third-stage evidentiary hearing where the following testimony was presented.

¶ 12 Allen testified defendant was his nephew. Allen said his memory had faded over the years and he had health issues, but he recalled the events of the night at issue. Allen's wife, three sons, and niece were asleep. At 12 or 12:10 a.m., defendant and his codefendants arrived at Allen's apartment. It was not unusual for defendant and his friends to come over at midnight to watch movies. Allen specifically remembered that neither defendant nor his codefendants had any mud or debris on them nor were they out of breath or perspiring when they arrived. At approximately 1:30 a.m., officers arrived and asked Allen if anyone had arrived recently, and Allen provided that defendant and his codefendants had been there for an hour. The officers searched the residence without Allen's consent and confiscated two sweatshirts and a pair of work boots. Allen stated the confiscated items belonged to him. Allen testified that defendant's trial counsel never contacted him, and had trial counsel contacted him, Allen would have cooperated and testified in accordance with his affidavit and testimony at the hearing.

¶ 13 Defendant testified trial counsel was going to subpoena Allen to testify, but he never did. Defendant assumed Allen was going to testify because the State was using his name, and defendant spoke to trial counsel several times regarding bringing Allen in to testify.

¶ 14 Trial counsel testified he reviewed the police report in this case prior to testifying. Counsel was aware defendant and his codefendants were apprehended in Allen's home while Allen was

5

present. While investigating, counsel spoke with Allen on the phone and Allen stated he was asleep in a back bedroom. Counsel recalled from the police report that Allen told the officers that defendant and his codefendants had just arrived at the apartment. Thus, counsel determined Allen could not offer more than what he had told the officers as he did not see defendant arrive and could not say when he arrived. Counsel said he informed defendant and Devetta Cherry, defendant's mother, regarding his conversation with Allen. Counsel said Cherry was very involved in defendant's case and he often discussed the case with her. However, he did not tell defendant or defendant's family that he was going to subpoena Allen to testify because, based on his conversation with Allen, Allen would have only corroborated the State's case. Counsel was questioned as to certain facts and his strategy throughout the case, but he was unable to recall some specific details. Counsel explained he no longer had the full case file and he typically only kept files for seven years.

¶ 15    Officer Scott Glowinke testified he was dispatched for the home invasion, and another officer informed him that three subjects were walking into an apartment building. The officers knocked on the apartment doors, and Allen answered the door at one apartment. Defendant and two other men were also present. Allen told the officers that the clothing articles seized did not belong to him and he did not expect defendant and his codefendants to come to his apartment. Further, Allen stated the three men arrived just before the officers had arrived.

¶ 16    Cherry testified she spoke with trial counsel at every court date who always said he was going to call Allen as a witness. When Cherry was asked how counsel explained why he was not calling Allen to testify, she replied, "[h]e was like well, with all the impeachment on the stand, they can't find them guilty anyway because it will come back faster than a rocket ship in appeal." It was Cherry's understanding that counsel never contacted Allen.

6

¶ 17 Postconviction counsel argued Allen's testimony would have been critical in further showing the officers' lack of credibility. First, the mask found near Allen's apartment carried DNA consistent with a codefendant but the mask was not properly handled in custody where an officer touched the mask with his bare hands and the crime laboratory did not receive the mask for five months after it had been recovered by officers. Second, officers did not initially tender a video of the photographic lineup and said it did not exist. Later, officers tendered the video, which showed the police chief handling the mask in question with his bare hands. Third, the identifications made from the photographic lineup were inadmissible due to their suggestive nature. Last, an officer who testified at a suppression hearing stated the suspects walked quickly and at another hearing said they were running, the same officer said he entered the apartment building 10 to 15 minutes after the suspects but then stated he observed the men out of breath when he entered, which went against the suggested timing of the events and the distances involved.

¶ 18 Postconviction counsel argued Allen's testimony would further contradict the officers by discrediting the police report, where it stated (1) defendant and his codefendants were described as out of breath with debris on their clothing and (2) Allen reportedly told the officers that (a) the confiscated clothing did not belong to him, (b) defendant and his codefendants arrived at the apartment unexpectedly, and (c) they arrived right before the officers had arrived. Counsel also noted defendant's statement in allocution during sentencing, where defendant questioned why Allen did not testify when the officers used Allen's statements for probable cause to arrest.

¶ 19 The State argued it had impeached Allen's statements and Allen's relationship to defendant gave reason for him to be untruthful. Further, the State questioned Allen's memory. As to defendant's statement in allocution, the State emphasized that defendant never specifically said his trial counsel was supposed to subpoena Allen to testify and failed to do so.

¶ 20          The court stated it reviewed all the documents and recalled the trial (the court also presided

over the bench trial). The court granted defendant's petition, noting trial counsel's testimony that

he talked to Allen, defendant's testimony that he relied on Allen's testimony, the issues with the

mask, issues with the motion to suppress the identification, and its prior rulings. The court ordered

a new trial. The State appeals.

¶ 21                                        II. ANALYSIS

¶ 22          On appeal, the State argues the court erred in granting defendant's petition based upon the

ineffective assistance of trial counsel. Specifically, the State contends the evidence failed to

establish that (1) trial counsel provided deficient performance regarding his decision not to call

Allen to testify and (2) defendant was prejudiced by this decision.

¶ 23          The Act provides a three-stage process for a defendant alleging a substantial deprivation

of his constitutional rights. *People v. Cotto*, 2016 IL 119006, ¶ 26. Here, the petition advanced to

a third-stage evidentiary hearing. See 725 ILCS 5/122-6 (West 2022). At the hearing, the defendant

bears the burden of making a substantial showing of a constitutional violation. *People v. Pendleton*,

223 Ill. 2d 458, 473 (2006). The court may receive affidavits, depositions, oral testimony, or other

evidence to weigh the merits of the petition and determine whether the defendant is entitled to

relief. 725 ILCS 5/122-6 (West 2022). The court acts as the finder of fact and determines witness

credibility, the weight given to the evidence, and resolves any conflicts in the evidence. *People v.

Domagala*, 2013 IL 113688, ¶ 34. Accordingly, we will not reverse the court's ruling on the

petition unless the decision is manifestly erroneous. *People v. Ortiz*, 235 Ill. 2d 319, 333 (2009).

Manifest error occurs when the error is "clearly evident, plain, and indisputable." (Internal

quotation marks omitted.) *People v. Morgan*, 212 Ill. 2d 148, 155 (2004).

¶ 24    The United States and Illinois Constitutions guarantee criminal defendants the right to the effective assistance of counsel. U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8. In determining whether defendant was denied the effective assistance of counsel, we apply the two-pronged test set forth in *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To prevail on this claim, a criminal defendant must demonstrate that "(1) counsel's performance was deficient and (2) the deficient performance prejudiced defendant such that he was deprived of a fair trial." *People v. Brown*, 2023 IL 126852, ¶ 11. In other words, the defendant must demonstrate that counsel's performance was objectively unreasonable under prevailing professional norms and that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. Failure to establish either prong of this test will be fatal to the claim. *People v. Richardson*, 189 Ill. 2d 401, 411 (2000).

¶ 25    We first address whether trial counsel's performance was deficient for not calling Allen to testify. The decision as to whether to call a particular witness is typically a matter of trial strategy which will not support a claim of ineffective assistance of counsel. *People v. Flores*, 128 Ill. 2d 66, 85-86 (1989). Nevertheless, "counsel may be deemed ineffective for failure to present exculpatory evidence of which he is aware, including the failure to call witnesses whose testimony would support an otherwise uncorroborated defense." *People v. Tate*, 305 Ill. App. 3d 607, 612 (1999); see *People v. Upshaw*, 2017 IL App (1st) 151405, ¶ 39. Additionally, "strategic decisions may be made only after there has been a thorough investigation of law and facts relevant to plausible options," so the failure to interview witnesses may indicate actual incompetence, especially where those witnesses are known to trial counsel and their testimony may be exonerating. (Internal quotation marks omitted.) *Upshaw*, 2017 IL App (1st) 151405, ¶ 39.

¶ 26    Here, we cannot find it was manifest error for the court to conclude trial counsel's performance was deficient. It is clear the court was presented with a conflict between the testimony of trial counsel and Allen and gave more weight to Allen's testimony. Further, Cherry's testimony supported Allen's testimony while Officer Glowinke's testimony supported trial counsel's testimony. We cannot say this credibility determination was in error as it was the court's role to resolve any conflicting testimony, and it was in the best position to do so as it had the opportunity to see and hear the witnesses. See *People v. Coleman*, 183 Ill. 2d 366, 384 (1998). We can point to no evidence or reason as to why the court should have indisputably believed one witness over another. The State suggests the court concluded that trial counsel lied. However, this is needlessly reductive and oversimplifies the conflict presented to the court. It had been over a decade since the case was tried, and trial counsel understandably had difficulty remembering aspects of defendant's case as he no longer had the complete case file to refresh his memory. However, the parts of defendant's case that trial counsel remembered were largely provided in the police report that he consulted prior to testifying. Thus, it is not that the court found that trial counsel was lying, but rather, trial counsel could not independently recollect the events that occurred and tried to fill in the gaps. Allen testified with certainty regarding the night in question and while he had health issues, it had no effect on his testimony or his memory of the events, and no evidence was presented to the contrary. It is not unbelievable that Allen would recall a night from years prior where his nephew and friends were arrested in his home and found guilty of the offenses in this case. Therefore, it was not error for the court to find that defendant established by a preponderance of the evidence that trial counsel's performance fell below an objective standard of reasonableness by failing to call Allen as a witness.

10

¶ 27    We also conclude the court did not err in finding that defendant was prejudiced by trial counsel's deficient performance as there is a reasonable probability that the result of the trial would have been different had Allen been called to testify. Allen would have been a favorable alibi witness and another means to challenge the testimony of the officers. There were several issues with the investigation, such as mishandling evidence and interfering with witness identification. Allen testified the officers searched his home without his consent and his testimony directly contradicted the information provided by officers and the police report.

¶ 28    In coming to this conclusion, we reject the State's position that there was ample circumstantial evidence to otherwise find defendant guilty as the evidence was not conclusive. The State cites the following: the officers observed mud or leaves on the defendants (Allen would have testified otherwise), the officers observed the defendants were out of breath and sweating (an officer provided inconsistent testimony as to whether the defendants were walking or running; questions were raised as to how the officers observed the defendants perspiring and out of breath after 10 to 15 minutes had passed since the defendants were seen entering the apartment when the defendants only moved half of a mile in 45 minutes),[1] the dollar denominations found on the defendants (an officer testified 10 $20 bills, 4 $5 bills, and 2 $1 bills were found on the defendants

---

[1]The State points to testimony from an officer providing that the distance between Dorothy's home (617 Gordon Terrace in University Park, Illinois) and Allen's home (701 Sandra Drive in University Park, Illinois) was four miles. The offenses occurred at approximately 1:15 a.m. and an officer observed the defendants enter Allen's home at approximately 2 a.m. Therefore, the State argues, it is logical why the defendants would still be perspiring and out of breath when the officers met them at approximately 2:10 a.m. (suggesting the defendants had just run four miles through a wooded area in 45 minutes). However, the testimony the State references is from an officer describing where he was located at the time he was dispatched, which happened to be four miles from Dorothy's home. The officer did not testify the distance from Dorothy's home to Allen's home was four miles. Rather, other testimony indicated the distance between the homes was only half of a mile. Further, we have independently acquired information from Google Maps indicating the distance between the locations is just under half of a mile, which we acknowledge could vary slightly depending on the route taken through the wooded area. See *Peters v. Riggs*, 2015 IL App (4th) 140043, ¶ 49 (concluding a court may take judicial notice of the distance between two or more locations by referencing Google Maps).

11

but later stated a total of $202 was recovered and he did not know where the 4 $5 bills came from), a mask was found in the woods near Allen's apartment and it carried DNA consistent with a codefendant (the mask was not properly maintained for custody as an officer handled it with his bare hands, it was submitted for testing five months later, and no connection was made to defendant); and the guns collected from the woods (the guns were not linked to any defendant). The remaining evidence is that defendants and his codefendants matched a physical description and were found in the vicinity of the crime.

¶ 29　　However, the trial judge who presided over the postconviction proceedings, including the third-stage hearing, was the same judge who presided over the bench trial. The judge stated she recalled the bench trial and her rulings in this case. Thus, her determination that there was a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different, cannot be taken lightly. Stated another way, the trial judge concluded, had Allen testified at trial, there was a reasonable probability she would not have found defendant guilty. This is unlike a jury trial or an instance where a different judge presides over the postconviction proceedings where the court is asked to speculate whether it would have made a difference—the actual trier of fact from the bench trial has found it would have likely made a difference in her decision.

¶ 30　　Last, the State takes issue with the court's consideration of the officer's handling of the mask and the photographic lineup. However, the State fails to cite any authority to support this contention, resulting in forfeiture of this argument. See *People v. Rivera*, 2020 IL App (2d) 171002, ¶ 11 (providing that the failure of a party to elaborate on an argument, provide a well-reasoned theory, or cite persuasive authority results in forfeiture). Thus, we need not consider it.

12

¶ 31        Accordingly, we find no clearly evident, plain, or indisputable error in the court's decision. Thus, the court's decision to grant defendant's petition was not manifestly erroneous.

¶ 32                                III. CONCLUSION

¶ 33        For the reasons stated, we affirm the judgment of the circuit court of Will County.

¶ 34        Affirmed.